# EXHIBIT 4

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 13-13591-shl

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  METRO AFFILIATES, INC., et al.,

9

10              Debtors.

11

12  - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              April 3, 2014

19              10:10 AM

20

21  B E F O R E:

22  HON. SEAN H. LANE

23  U.S. BANKRUPTCY JUDGE

24

25

1

2 Doc. #959 Application to Employ / Application of the Debtors

3 for an Order Authorizing the Employment and Retention of Hilco

4 Industrial LLC, Reich Brothers, LLC and Alex Lyon & Son Sales

5 Managers & Auctioneers, Inc. as Marketing and Sales Agent for

6 the Debtors and Debtors in Possession

7 Withdrawn

8

9 Doc. #991 Motion to Approve / Debtors Motion for Approval of

10 the Sale of Certain Assets to Factory Direct Bus Sales, Inc.

11 and Quality Bus Service, LLC

12

13 Doc. #999 Motion to Compel / Debtors Motion for an Order

14 Directing Issuance of Replacement Vehicle Titles

15

16

17

18

19

20

21

22

23

24

25

1

2  Doc. #124 (Status Conference) Memorandum of Law in Support of

3  Motion of Local 1181 (A) Pursuant to Federal Rule 60(b) and

4  Bankruptcy Rule 9024, for Relief from the Court's Order

5  Enforcing Automatic Stay Entered November 8, 2013 and (B) in

6  the Alternative, Pursuant to 11 U.S.C. Sections 361 and 363,

7  for Adequate Protection [Related docket No. 57]

8

9

10

11

12

13

14

15

16

17

18

19

20  Transcribed by:  Sharona Shapiro

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

1

2  A P P E A R A N C E S :

3  AKIN GUMP STRAUSS HAUER & FELD LLP

4         Attorneys for Debtors

5         One Bryant Park

6         New York, NY 10036

7

8  BY:   LISA G. BECKERMAN, ESQ.

9         MITCHELL P. HURLEY, ESQ.

10        RACHEL EHRLICH ALBANESE, ESQ.

11        DEAN L. CHAPMAN, JR., ESQ.

12

13

14  MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

15        Attorneys for Local 1181

16        1350 Broadway

17        New York, NY 10018

18

19  BY:   RICHARD A. BROOK, ESQ.

20

21

22

23

24

25

```
 1
 2   MEYER, SUOZZI, ENGLISH & KLEIN, P.C.
 3          Attorneys for Local 1181 Union
 4          990 Stewart Avenue, Suite 300
 5          Garden City, NY 11530
 6
 7   BY:   HOWARD B. KLEINBERG, ESQ.
 8
 9
10   CARTER LEDYARD & MILBURN LLP
11          Attorneys for Bank of New York Mellon as
12          Indenture Trustee and collateral agent
13          2 Wall Street
14          New York, NY 10005
15
16   BY:   JAMES GADSDEN, ESQ.
17
18
19   FARRELL FRITZ, P.C.
20          Attorneys for Creditors' Committee
21          1320 RXR Plaza
22          Uniondale, NY 11556
23
24   BY:   VERONIQUE A. URBAN, ESQ.
25
```

1

2  NEW YORK CITY LAW DEPARTMENT

3       Office of the Corporation Counsel

4       Attorneys for New York City and

5       New York City Economic Development Corporation

6       100 Church Street

7       New York, NY 10007

8

9  BY:   ZACHARY B. KASS, ESQ.

10

11

12  SCOTT A. ROSENBERG, P.C.

13       Attorneys for Quality Bus Sales, Inc., and

14       Factory Direct Bus Sales

15       2400 Jericho Turnpike

16       Suite 201

17       Garden City Park, NY 11040

18

19  BY:   KEVIN R. TOOLE, ESQ.

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURT:  Good morning.

3              IN UNISON:  Good morning.

4              THE COURT:  We're here this morning for Metro

5    Affiliates, Inc.  Proceed.

6              MS. BECKERMAN:  Good morning.  I assume you'd like

7    appearances first.

8              THE COURT:  Sure, please.

9              MS. BECKERMAN:  Lisa Beckerman, Rachel Albanese, Mitch

10   Hurley, and Dean Chapman from Akin Gump, on behalf of Metro

11   Affiliates, Inc. and their affiliated debtors.

12             MS. URBAN:  Good morning, Your Honor.  Veronique Urban

13   of Farrell Fritz, representing the official committee of

14   unsecured creditors in these cases.

15             THE COURT:  Good morning.

16             MR. GADSDEN:  James Gadsden, Carter Ledyard & Milburn,

17   LLP, for the Bank of New York Mellon as indenture trustee and

18   collateral agent.

19             MR. KLEINBERG:  Good morning, Judge.  Howard

20   Kleinberg, Richard Brook, Meyer, Suozzi, English & Klein, for

21   Local 1181.

22             MR. TOOLE:  Kevin Toole, Your Honor, Scott A.

23   Rosenberg, P.C., for one of the purchasers, Quality Bus Sales,

24   Inc., and also Factory Direct Bus Sales.

25             THE COURT:  All right.

1          MR. KASS:  Good morning, Your Honor.  Zachary Kass

2    from the New York City Corporation Counsel's Office.

3          THE COURT:  All right.  Good morning to you all.  Good

4    to see you.  All right.  I know we have a few motions on that

5    were part of an agenda in that binder that was sent to me, and

6    I know also that we have left over the reconsideration motion,

7    which hasn't been ruled on yet, in light of discussions, but it

8    sounds like today is the day.

9          MS. BECKERMAN:  Yes, Your Honor.  What I would propose

10   to do is update you on a few things first, then go through the

11   agenda.  I'm going to apologize in advance, but my declarant

12   for our motion, which is number C on the agenda, the

13   replacement vehicles titles --

14         THE COURT:  Right.

15         MS. BECKERMAN: -- isn't here; he's running late.  And

16   so I would put that to the end --

17         THE COURT:  That's fine.

18         MS. BECKERMAN: -- with the hope that he'll show up

19   before -- if he shows up before we get to it, I'll obviously go

20   in order, and if not, we'll have the status conference and

21   whatever else Your Honor wants to do with respect to --

22         THE COURT:  All right.

23         MS. BECKERMAN: -- the other motion, and that will go

24   at the end of the agenda.  I'm very sorry about that.

25         THE COURT:  It seems to be a fairly uncontroversial

1  motion, I would add.

2           MS. BECKERMAN:  It is, but still.

3           THE COURT:  That's fine.  We'll figure it out.

4           MS. BECKERMAN:  Okay, letting you know.  Okay.  So

5  Your Hon --

6           THE COURT:  Of course, you know when you give those

7  speeches, you almost automatically summon the person, and if

8  you hadn't given that speech then the person wouldn't show up

9  at all, so I think you've covered yourself by giving that

10 speech.

11          MS. BECKERMAN:  I hope so.  We'll see.

12          Okay.  Your Honor, as you may remember, when I was

13 before you the last time, I had mentioned two things that I

14 thought would be coming up, and I just figured I'd report on

15 those two things.

16          The first was we did file our plan and disclosure

17 statement, as I mentioned to you, on --

18          THE COURT:  I saw that.

19          MS. BECKERMAN: -- on Monday.  And so obviously we have

20 scheduled our disclosure statement hearing, as we discussed, on

21 the 29th, so that's been noticed out and we're moving ahead

22 with that.

23          With respect to the Hilco motion, which Your Honor saw

24 we adjourned and now we withdrew, I thought I would give you

25 some color on that.  We had discussed that a bit briefly, and

1    of course Your Honor turned out, of course, to be correct.  We

2    ended up with sort of a variation on item 2 that I had

3    mentioned to you, and you'd pointed out I'll have a third way

4    the next time, so it's probably pretty accurate.

5            What happened is, Your Honor, we -- as I said to you

6    the last time we were in court, we had gone ahead and filed

7    that motion, and as we were getting up to the hearing, we had

8    received a couple of bids.  First we'd received one bid that

9    made us decide to adjourn the hearing.  That was for all the

10   buses, and when we did the math on the cost of our having to

11   have the 120-day process with Hilco, where we needed to have

12   payments for our rent and our security and utilities and

13   everything else, and given the condition of our buses, which

14   was a basis for the guaranteed amount being downgraded to a

15   different amount that was in the contract, our concern was that

16   we were already at a point that it was pretty close that that

17   might not make a lot of sense to be proceeding the way we were

18   proceeding.  So we adjourned the motion.

19           We then received not only that bid from Garcia Bus,

20   but we received another bid for all the buses from Merchants,

21   and we had some back and forth.  And we decided, after the back

22   and forth that we'd been having over the phone, sort of on a

23   daily basis, where we talked to one person and then we talked

24   to another person, and all that, including Hilco, by the way,

25   who was participating in that at one point for one part of it,

1  we decided at the end of the day the best thing to do was to

2  have a telephonic auction, which interestingly enough, we had

3  last night on the telephone.  And Hilco decided not to

4  participate and asked us to withdraw the motion, which we did.

5  We had Mr. Garcia and his lawyer on the phone, and obviously

6  Mr. Singer from Merchants, and we went a number of rounds, and

7  at the end of the day, the original bid that we'd received from

8  Mr. Garcia -- just for your understanding, when we started this

9  process, that made us decide to adjourn, it was about 900,000

10 dollars for the remaining buses, and where we ended up at the

11 end of the bidding was Mr. Garcia was the winning bidder but it

12 was 1.205 million for the buses.

13         So that was what we did yesterday.  In addition, Your

14 Honor may recall that we have one piece of owned property

15 remaining that we have lots of buses parked on.  And that is a

16 property called Red Lion in New Jersey.  It was one our two

17 owned properties, one we didn't sell.  And we have received,

18 again, some bids.  We'd actually received bids from three

19 bidders for that property.  And Rothschild had been going back,

20 a little bit, back and forth as well on the phone, with

21 bidders, getting the price up a bit.  And we decided, after we

22 had had the interest from the three bidders enough that we'd

23 gone a couple of rounds, that it made sense to have an auction

24 as well for that.

25         So we also did that last night on the telephone.  And

1    those three bidders participated.  That was also Garcia Bus,

2    McGough Bus, who's been a party to one of our prior sales, and

3    a gentleman by the name of Robert Hauss (ph.).  And we had a

4    number of rounds of that as well on the phone.  And we ended up

5    at 430,000 dollars for that property.  Mr. Hauss was the

6    winner, and Garcia Bus was the backup bidder.  So we will be

7    filing motions for those, but I just wanted to let you know

8    that that was what was going on, and so those will be upcoming.

9         THE COURT:  All right.  Thank you for the update.

10         MS. BECKERMAN:  Sure.  Okay.  I guess now I'll turn to

11    the agenda, and because we'd withdrawn that Hilco motion, the

12    first item on the agenda would be the Factory Direct and

13    Quality Bus Service motion.  I'm going to turn the podium over

14    to Ms. Albanese.

15         MS. EHRLICH ALBANESE:  Good morning, Your Honor.

16    Rachel Ehrlich Albanese of Akin Gump on behalf of the debtors.

17         The first item, as Ms. Beckerman mentioned, is the

18    debtors' uncontested motion to sell certain buses to Factory

19    Direct, Bus Sales, Inc., and Quality Bus Sales, LLC (sic),

20    pursuant to Section 363(b) of the Bankruptcy Code.  In

21    preparation for today's hearing, the debtors realized last

22    night, actually, that the three buses to be sold to Factory

23    Direct actually already were included in the APA that Your

24    Honor approved last month.  And Factory Direct, we believe,

25    closed on those buses on March 18th.  However, Factory Direct's

1  counsel has been unable to confirm that fact with his client,

2  given the short time frame in which this fact was realized.

3  And so to the extent that it is necessary -- we're going

4  forward with approval of that motion today -- hopefully we can

5  get information in real time and let Your Honor know that it

6  has been already sold.  But the order has been revised just to

7  reflect the Quality Bus transaction, and I have a redline to --

8                THE COURT:  All right.

9                MS. EHRLICH ALBANESE:  -- give to Your Honor.  If I

10 can approach?

11               THE COURT:  Yes, please.

12               MS. EHRLICH ALBANESE:  Thank you.

13               THE COURT:  Thank you very much.  And I would assume

14 that before I would sign the order you would know whether

15 Factory Direct is in or out.

16               MS. EHRLICH ALBANESE:  That's correct.  And if in fact

17 Factory Direct --

18               MR. TOOLE:  Actually, if I'm not mistaken, Your

19 Honor -- Kevin Toole for the buyers -- the marked up order only

20 addresses the larger, which I think is thirty some odd buses --

21               MS. EHRLICH ALBANESE:  Thirty.

22               MR. TOOLE:  -- transaction.  And that we would ask the

23 Court to go ahead --

24               THE COURT:  Right.

25               MR. TOOLE:  -- review and enter.  If in fact it turns

1   out that the three buses in question were part of the prior

2   deal and my client's already gotten them, then the three-bus

3   transaction, that we're asking the Court to conditionally

4   approve now, would be, in essence, withdrawn.  But if it

5   determines that we are in fact buying those three buses, then

6   the debtor will submit a similar order just with respect --

7              THE COURT:  All right.

8              MR. TOOLE:  -- to that transaction.

9              THE COURT:  Thank you.

10             MR. TOOLE:  Thank you.

11             MS. EHRLICH ALBANESE:  Thank you for the

12  clarification, Mr. Toole.

13             So Your Honor, in support of this motion, the debtors

14  filed the declaration of Jay Johnson of Rothschild.  Mr.

15  Johnson unfortunately had to be in Houston for work today, but

16  Mr. Johnson's colleague, Emil Giliotti is here today and he is

17  available if the Court or other parties have any questions for

18  him.

19             THE COURT:  All right.  Does anyone have any questions

20  for -- his last name is --

21             MS. EHRLICH ALBANESE:  Giliotti.

22             THE COURT:  -- Giliotti -- of Mr. Giliotti relating to

23  this motion?

24             All right.  I don't see anyone and I do not have any

25  questions myself.  Thank you.

1        MS. EHRLICH ALBANESE:  Thank you, Your Honor.  So if
2   the Court will permit, I would like to move Mr. Johnson's
3   declaration into evidence.
4        THE COURT:  All right.  Any objection?
5        Hearing no objection, it is admitted.
6   (Declaration of Mr. Johnson was hereby received into evidence,
7   as of this date.)
8        MS. EHRLICH ALBANESE:  Thank you.  The purchased
9   assets were marketed for almost two months -- excuse me --
10  prior to the December auction, and no bids were received on
11  those assets at the auction or in the early part of this year.
12  Following last month's 2.1-million-dollar sale to Factory
13  Direct, Mr. Toole contacted the debtors with a proposal for
14  Factory Direct and Quality Bus to purchase additional buses.
15  The total purchase price for the new transactions was less than
16  the sale cap of 500,000 dollars that was established in the
17  miscellaneous asset sale procedure order, but that order
18  requires notice and a hearing for a sale of miscellaneous
19  assets or a series of related transactions to a single buyer or
20  group of related buyers for a total consideration greater than
21  the sale cap.  As a result, the debtors filed the motion for
22  approval of the new Factory Direct and Quality Bus sale
23  transactions.
24       So as modified, the motion seeks approval for Quality
25  Bus to purchase thirty of the debtors' buses for a purchase

1  price of 316,286 dollars, which is 36 percent of orderly
2  liquidation value, or OLV, for those assets.  The three Factory
3  Direct buses were for a purchase price of approximately 110,000
4  dollars, which is 90 percent of OLV, similar to the OLV that
5  Factory Direct paid for the prior buses.

6          As set forth in the Johnson declaration, the debtors
7  believe that the proposed purchase price is the highest or
8  otherwise best value for those assets, under the circumstances
9  of these Chapter 11 cases, even though it is less than a
10 hundred percent of OLV.  The buses that Quality Bus and Factory
11 Direct are purchasing were marketed at length and received no
12 bids at auction or otherwise.  In addition, as Your Honor has
13 heard before, many of the buses are not in optimal condition,
14 and if it were not for these offers, those vehicles would have
15 been included as part of the assets subject to liquidation.

16         Your Honor previously determined, in connection with
17 the Factory Direct sale, that Factory Direct was a good-faith
18 purchaser, and to the extent necessary today, we are seeking
19 the same finding from Your Honor.  The debtors believe that
20 Quality Bus, like Factory Direct, is a good-faith purchaser
21 deserving of the protections afforded by Section 363(m) of the
22 Bankruptcy Code.

23         Quality Bus engaged in the sale process in good faith,
24 as part of an arm's-length transaction.  Although Quality Bus
25 is an affiliate of Factory Direct, it is completely

1    unaffiliated with the debtors, their directors and their

2    officers.

3            The sale agreement with Quality Bus is the product of

4    the parties' arm's-length good-faith negotiations, and the same

5    is true of Factory Direct, Your Honor.  The debtors are looking

6    to close the proposed sale as soon as possible in order to

7    reduce the debtors' carrying costs, such as for storage and

8    security.

9            Accordingly, unless Your Honor has any questions, the

10   debtors respectfully request that the Court approve the

11   proposed sales.

12           THE COURT:  All right.  I do not have any questions.

13           Anyone wish to be heard on the proposed transactions?

14           All right.  Hearing no one and seeing no objection, I

15   will grant the motion as to Quality Bus Service, LLC.  And to

16   prevent you from having to come back here, I will also approve

17   it as to Factory Direct Bus Sales, for those three buses, to

18   the extent that they were not contained in the prior APA.  I

19   will just trust that you will reach out to chambers just to let

20   us know, when the order is ready to go, which form of order to

21   use.

22           I find that the sale is consistent -- both sales are

23   consistent with Section 363.  There's a sound business

24   justification for the proposed sale as required by the statute

25   and case law.  I will grant the request to sell the items free

 1  and clear of claims, liens and encumbrances and other

 2  interests, pursuant to Section 363(f).  I find it appropriate

 3  to sell them free and clear of successor liability.

 4          I also will extend the protections of a good-faith

 5  purchaser under Section 363(m) for Quality Bus Services, based

 6  on the information provided in the motion here today.  I will

 7  also re-extend it -- I guess nothing's changed as to Factory

 8  Direct, and I had earlier extended a 363 in a protection for

 9  prior sales involving that company, and I will extend it for

10  this sale involving that company, to the extent it has not been

11  mooted by the other APA.

12          MS. EHRLICH ALBANESE:  Thank you, Your Honor.

13          THE COURT:  Thank you.

14          MR. TOOLE:  Your Honor, just the one -- I may have

15  misunderstood.  I think we would ask the Court to go ahead and

16  enter the new form of order with respect to the interim --

17          THE COURT:  Well, I'm going to wait till you figure

18  out whether these three buses are in the prior APA or not, and

19  then you're going to get me whatever order is appropriate to

20  enter.  I am conditionally approving it, based on the

21  information I have in front of me, to the extent it's not in

22  the prior APA.  So your order will either have it in if it

23  wasn't covered, or will take it out if it was covered.  So I'll

24  just wait for you all to let me know, as soon as you know, what

25  appropriate form of order should be entered.

1          MR. TOOLE:  All right.  Thank you.

2          THE COURT:  Thank you.

3          MS. EHRLICH ALBANESE:  Thanks, Your Honor.

4          THE COURT:  That way no one has to come back or worry

5    about any further proceedings.

6          MS. BECKERMAN:  All right, Your Honor, as you guessed,

7    my declarant has arrived, so I'm going to proceed next on the

8    agenda with the motion for an order directing issuance of

9    replacement vehicle titles.

10         Your Honor, this is a situation that arises out of two

11   of our miscellaneous asset sales, one to Academy and one to

12   Franmar, both of which have closed, and the debtors have been

13   paid the purchase price.  One of the vehicles, as set forth in

14   the motion, is a vehicle where the debtors had gone ahead and

15   exercised a lease buyout right back in 2009.

16         And I guess I'm going to stop here for a moment and

17   say I had also filed the declaration of Mr. Dinaburg, who's in

18   the courtroom, our controller, Mr. Dinaburg.  And I would like

19   to move that into evidence before I get further into the facts.

20         THE COURT:  All right.  Anyone object?

21         Seeing no objection, I will admit that declaration.

22   (Declaration of Mr. Dinaburg was hereby received into evidence,

23   as of this date.)

24         MS. BECKERMAN:  Okay.  And the problem is that the

25   party that we had the lease with, and who had the lien on the

1   bus, is a company called -- you know, basically, who's gone out

2   of business, unfortunately, from our records.  We've tried to

3   locate the company, as we mentioned before in our pleading, and

4   unfortunately we had no luck.  And not only ourselves, we tried

5   to locate Trans Equipment Finance, but also when we spoke to

6   the New Jersey Motor Vehicle Commission, they don't have any

7   address beyond Addison, Texas for the party in their records.

8   So we were unable to serve them, because we have no loca -- we

9   could not reach them.  We did a very broad search, through any

10  database we have at Akin Gump, access to for corporations, and

11  we weren't able to find them as an existing corporation any

12  more on the records.  They appear to have dissolved.  We have

13  no address.

14          Unfortunately, the New Jersey Motor Vehicle

15  Commission, even though we had paid for the buyout price in

16  2009, and therefore there isn't any basis for this party having

17  a lien on the bus anymore, because that was in connection with

18  the leasing arrangement, that when we bought out that would

19  have gone away.  We don't have a way of getting the title

20  clear, absent a court order, unfortunately.  So that's why

21  we're here today requesting that.

22          Academy's counsel has tried.  We've tried.  We both

23  looked to try to find the party.  We've looked through every

24  possible source we could find, and we've tried within the Motor

25  Vehicle Commission.  And we're just stuck, unfortunately.  And

1   because, of course, the vehicle has been paid for and

2   delivered, Academy legitimately would like clean title to the

3   vehicle, and we have no reason to think that they shouldn't

4   have clean title to the vehicle, since we've had title to --

5   we've paid for it, and we've had it for -- in our possession,

6   fully paid for, for years.  So we're seeking relief from Your

7   Honor to assist us with that problem.

8          In addition, with respect to two of our vehicles, we

9   had originally -- again, these were sold as well to Academy --

10   these two vehicles were vehicles that were originally

11   Caterpillar leased vehicles.  But as Mr. Dinaburg's declaration

12   indicates, in 2013, the buyout price was paid; we have evidence

13   that we paid the buyout price to Caterpillar.  We obviously

14   served Caterpillar; they had no objection whatsoever to this

15   motion.  And there's no question that we paid the buyout price.

16          The problem is, again, that when the Motor Vehicles

17   Commission was contacted about the titles -- because we don't

18   have them in our possession, and they never delivered them to

19   us.  They say that they delivered them to the Bank of New York

20   Mellon.  The Bank of New York Mellon, who we've obviously been

21   dealing with on a tremendous amount of vehicles, has done a

22   search of their records as well, has absolutely no evidence

23   that they were delivered the titles either.  And the reason

24   that the Bank of New York Mellon might have been delivered the

25   titles, in theory, is because once we exercised a buyout right,

1  we were obligated, under our indenture, to then put a lien on

2  it for the benefit of Bank of New York Mellon.  So it's

3  understandable why that might be in the records, but it doesn't

4  appear anybody can locate it.

5          Again, it's the same situation where we have absolute

6  proof we paid the buyout price.  It's attached to the

7  declaration.  We noticed the party that was our prior lessor,

8  who has obviously not objected.  They're not questioning that

9  either.  But we just can't get the Motor Vehicles Commission,

10  either ourselves or Academy, to accept our paper trail.  And

11  unfortunately, we are required to get an order in order to get

12  title delivered to Academy.  And same thing, that they have

13  paid the price, we've delivered the vehicle to them; we just

14  can't get the title re-registered.

15          So that's why we're here before Your Honor.  Ourselves

16  and Academy's counsel have made a very good-faith effort, as

17  well as Mr. Shin, from Silverman Shin, the debtors' lawyer who

18  has been handling most of the titles.  Everybody has made

19  efforts with the Commission.  We've been unable to get these

20  problems resolved.  The Commission has told us that it will

21  require a court order.  We have come back to you seeking a

22  court order, and therefore, we would ask the Court to grant the

23  relief we're requesting in the motion, which is basically

24  directing the New Jersey Motor Vehicle Commission to issue a

25  certificate of title, free and clear of all liens, in the name

1  of the applicable purchaser, Franmar, in the case of one

2  vehicle, Academy, in the case of the other two, provided that

3  Academy and Franmar pay all the costs of issuing the title, you

4  know, the stamps and other duties.

5         So we'd ask the Court grant the motion that's

6  requested.

7         THE COURT:  All right.  Anyone wish to be heard on

8  this motion?

9         All right.  Seeing no one rise and seeing no objection

10 to the motion on the docket, I will grant the motion.  When I

11 first took the bench, I had more than a few judges warn me

12 about invoking Section 105 on any regular basis, as it provides

13 general language about a court's authority to do all sorts of

14 things, and I found that to be good advice.  And this is a

15 happy occasion that's exactly meant for 105, because it allows

16 a court to take action necessary and appropriate to enforce and

17 implement its court orders and carry out provisions of the

18 Bankruptcy Code.  And actually that authority was retained in

19 the miscellaneous assets order as well.  So I'm happy to grant

20 the requested relief so the transactions can finally be put to

21 bed.

22        MS. BECKERMAN:  Thank you very much.  I am sure

23 Academy and Fran mar's counsel thanks you as well.

24        THE COURT:  My pleasure.

25        MS. BECKERMAN:  Okay.  Then Your Honor, the next item

1   on the agenda is the status conference with respect to Local

2   1181's motion.  So I'm going to turn over the podium --

3            THE COURT:  All right.

4            MS. BECKERMAN:  -- to the various parties for that.

5            MR. GADSDEN:  Your Honor, if this is the last matter

6   on, could I be excused?

7            THE COURT:  By all means.  Thank you.

8            All right.  I think we had set today down, after the

9   numerous times it's been up for a hearing, for me to make a

10  decision, unless the parties had worked out some sort of

11  resolution.  And I take it by the lack of an update on that

12  score, that no resolution has been reached, so what's left is

13  for me to rule on the motion for reconsideration.

14           MR. KLEINBERG:  Well, let me at least address the

15  status, Your Honor.  We took up your suggestions, three weeks

16  or so ago, seriously, that we entered into negotiations with

17  the debtors, counsel for the DOE.  I'm not going to

18  characterize those negotiations, but as we sit here today, no

19  agreement was reached.  However, given that Your Honor raised

20  the question of whether a practical solution can be reached,

21  I'm just wondering whether Your Honor would want to, before

22  declaring this a yes or a no situation, hear about the status

23  of the negotiations, where we were, on or off the record --

24           THE COURT:  I --

25           MR. KLEINBERG:  -- or --

1          THE COURT:  I don't know -- I mean, I'm subject to

2     hearing from people on that subject, but I will just tell you

3     my initial impression is that that's not a good idea, because I

4     have to decide the motion.  And so I was asked to leave the

5     door open, to the extent that there were unintended

6     consequences in the order, other than what I thought I was

7     addressing, which is really the Weber case and what's property

8     of the estate.  But I don't know; that can get very tricky in

9     terms of wading into things that deal with settlement, and for

10    the most part, in almost all cases, and I think since I've been

11    on the bench, in all cases, if I'm the decider, for lack of a

12    more appropriate word, then I don't weigh into settlement.  So

13    unless somebody has something they want to tell me that changes

14    that calculus, I know every case is different, so let me hear

15    from the other parties involved.

16          MR. KLEINBERG:  Well, if I may just finish one

17    thought, as an alternative to my first suggestion, an

18    alternative might be that the parties submit to Your Honor

19    counter proposed versions of the order that had been

20    negotiated.  And Your --

21          THE COURT:  Well, no --

22          MR. KLEINBERG:  And Your Honor --

23          THE COURT:  -- I just have a motion.  I don't know

24    what counter-proposed orders you're talking about.  I entered

25    an order there was on the docket, docket number 57, the order

1    that granted the motion to enforce the automatic stay.  That

2    was entered.  If parties have an agreement about any tweaks

3    that should be made that would resolve your motion for

4    reconsideration, great, but if we're in counter-proposed order

5    land, I think, for the most part, that means that there's no

6    agreement and that I don't know what authority I'd have to do

7    anything until I decide the motion.  But again, you're closer

8    to the dispute than I am, so let me hear from the other parties

9    as to whether there's anything that I'm missing on that score.

10           MR. KLEINBERG:  Well, just to be clear, Your Honor, we

11   negotiated the terms of the proposed amended order that would

12   amend the order that Your Honor just referenced and also

13   resolve the current motion.

14           THE COURT:  Yeah, but you either --

15           MR. KLEINBERG:  It was not until --

16           THE COURT:  -- reached an agreement or you --

17           MR. KLEINBERG:  No, we did not.

18           THE COURT:  -- or you - -right.

19           So I don't -- again, that gets into, in a slightly

20   different form, talking about the parties' settlement

21   positions, right?  Because you say, well, here's my settlement

22   position that's memorialized in this version order, and my

23   settlement position is memorialized in this other version of

24   the order.

25           So again, I can see and appreciate you're striving

1   towards trying to resolve this in some way, and I appreciate

2   that.  I realize my own role in that has certain parameters,

3   giving parties an opportunity, and trying to listen carefully

4   as to what parties want to do.  But at a certain point, my role

5   reaches its boundary and there's not a whole lot more that I

6   can do.

7            And I think this motion's been around since November.

8   So I think we've given it, perhaps, all the -- I'm sorry, the

9   original motion was filed in November, but I think this was

10  filed either just before the beginning of the year or at the

11  beginning of the year.  So I think we've given it enough rope,

12  at this point.

13           Again, let me hear from the other parties involved to

14  see if there's something I'm missing on that score.

15           MR. HURLEY:  Your Honor, Mitch Hurley for the debtors.

16  We're in complete agreement.  We gave it a try to see if we

17  could work out a tweak, as you put it in the last conference.

18  We weren't able to do that.  And the debtors would, I guess,

19  object to going through kind of chapter and verse of the

20  negotiations, if you don't think it would be appropriate or

21  productive.  So we would --

22           THE COURT:  All right.

23           MR. HURLEY:  -- just seek a ruling.  Thank you.

24           THE COURT:  All right.

25           MR. KASS:  Good morning.

1          THE COURT:  Good morning.  You can feel free to be

2  there or over here, wherever --

3          MR. KASS:  That's fine.

4          THE COURT:  -- you're most happy.

5          MR. KASS:  Zachary Kass on behalf of the Department of

6  Education.  We also tried.  I think the union's suggestion that

7  an amended order might be considered is another approach.  In

8  other words, if we were to take the approach that either the

9  union or the DOE were to make a motion for the entry of an

10 amended order rather than take the reconsideration route, in

11 that situation, the union or possibly the DOE, could propose

12 what it believes is an appropriate amended order.

13          In that regard I would just like to remind the parties

14 and the Court that the order that was entered -- the original

15 order -- did say that a second order or another order might be

16 appropriate.

17          THE COURT:  Right.

18          MR. KASS:  Particularly with respect to the payments.

19 So that's an alternative route that would sort of -- I know

20 this is a controversy that's sort of been hanging in the air.

21 But that's another approach that would, in fact, perhaps, give

22 the union a chance to put before the Court in an appropriate

23 way --

24          THE COURT:  Right.

25          MR. KASS:  -- its view of what would be the right way

1  to approach this problem and there we could chime in as well.

2        THE COURT:  My only concern -- maybe I shouldn't say

3  "my only" -- but my concern is that with that approach, one is,

4  we've been doing this for a while now, and at a certain point,

5  I think judges have a concern that excessive delay just becomes

6  its own problem.

7        And the other concern is that I think that we will

8  just end up relitigating this dispute through the form of an

9  order.  And so we're going to start the clock back at the

10 beginning, but just using a different vehicle.  And I think if

11 we were in January, I think I might say let's give it a shot.

12 But it's April.

13       So at this point -- I'm always open to trying to build

14 a better widget, so to speak, and recognize that the parties

15 are closer to this dispute than I am, and there are times when,

16 given the posture of a dispute, the way it's presented to the

17 Court, I'm interesting in addressing and have been asked to

18 address a particular issue, and there can be spillover effect,

19 unintended consequences.  So that's fine.

20       But at the same point, I'm not all that enthused about

21 starting the clock back and zero now.  I don't know that it

22 really holds out any promise of a solution, given that parties

23 have already talked about that order.  So I think it would be a

24 motion that would be opposed, and then we would just have two

25 motions on the docket.

1           But again, I appreciate, I think, counsel have been

2    very professional in trying to work this out under the

3    circumstances.  So as a judge, I really can't ask for anything

4    more than that.  And I think that folks have more than answered

5    the call on that.  So I appreciate it.

6           All right, with that said, I'm just going to rule on

7    the motion that I have in front of me.  And let me proceed with

8    that.

9           Before the Court is the union's motion for

10   reconsideration or modification of the order enforcing the

11   automatic stay pursuant to Section 11 U.S.C. Section 362(a).

12   That order was entered by this Court on November 8th, 2013.

13   And we'll refer to that as "the enforcement order".  And it's

14   at ECF number 57.

15          The debtors commenced this Chapter 11 case on November

16   4th, 2013.  The following day, the debtors filed a motion

17   seeking enforcement of the automatic stay.  That's the

18   enforcement motion found at ECF number 20.  In that motion, the

19   debtors sought entry of an order enforcing the automatic stay

20   and preventing nondebtors from, in their view, wrongfully

21   withholding estate property and continuing litigation that

22   would have a direct adverse impact on the estate.

23          The background for that motion and the ongoing dispute

24   is set forth in the Court's enforcement order.  But broadly

25   stated, the debtors were part of a group of busing contractors

1    that held various transportation contracts with the New York

2    City Department of Education, that is, the DOE.  Pursuant to

3    these contracts, the DOE remitted monthly payments to the

4    individual contractors, including the debtors, for services

5    rendered.

6         The DOE contracts contained various employee

7    protection provisions, so-called EPPs, for certain unionized

8    workers who were members of Local 1181.  Specifically the DOE,

9    under those, may withhold money from payments to contractors if

10   a finding is made that a contract has violated the EPPs.

11        As it turns out, the collective bargaining agreement

12   between the contractors and Local 1181 expired, and the

13   contractors declared a labor impasse and imposed new terms.

14   There have been at least three pieces of litigation as to

15   whether the labor impasse was improperly declared and the

16   relating question of whether the EPPs had been violated.

17        In October of 2013, the DOE began withholding money

18   from the payments it made to the debtors as a "security", in

19   the event that the litigations on these issues were decided

20   against the contractors.  This withholding occurred even though

21   there had been no finding that the debtors or any other

22   contractors violated the EPPs in the DOE contracts.

23        As the enforcement order explicitly notes, there

24   didn't appear to be any dispute at the hearing, nor does there

25   appear to be any now, as to all these relevant facts, including

1   that there had been no final adjudication made in the

2   litigations of these issues.

3            The Court held a first-day hearing on November 6,

4   2013, at which it considered the enforcement motion.  And

5   although no parties filed a written response to the enforcement

6   motion, counsel appeared on behalf of the City of New York DOE,

7   on behalf of Local 1181-1061 Amalgamated Trans Union AFL-CIO,

8   the union.  The Court afforded both DOE and the union an

9   opportunity to raise arguments on the enforcement motion.

10           The debtors and counsel for DOE agreed that there had

11  been no finding that the EPPs had been violated.  That was at

12  the hearing transcript page 119 through 120 and also 121.

13           The union's counsel initially stated it did not object

14  to DOE making full payment with no holdbacks for the months of

15  October, November, December, but later stated that he wanted to

16  reverse that position and preserve the union's rights.  And

17  that's at the hearing transcript, pages 124 and 126.  But at

18  that time, the union articulated no argument as to why the

19  funds were not property of the estate.

20           So on November 8th, 2013, the Court entered an order

21  enforcing the automatic stay.  This enforcement order, again,

22  found at ECF number 57.  Pursuant to the enforcement order, the

23  DOE was directed to turn over the withholding from payments to

24  the debtors for services rendered in September and October

25  2013, and the enforcement order prohibited the DOE from

1    withholding any portion of future payments to the debtors for

2    services provided in October, November and December.

3           On November 22nd, 2013, the union filed this

4    reconsideration motion seeking relief under Rule 60(b)(1) and

5    (b)(6).  In the motion, the union argues that it was not

6    afforded sufficient time to respond to the enforcement motion;

7    the debtors should have raised the issues in an adversary

8    proceeding; the debtors didn't confer with the union prior to

9    the petition date; and the union's opportunity to argue its

10   position was truncated at the hearing.  The motion also

11   presents a variety of arguments on the merits.

12          No hearing on this reconsideration has been heard up

13   till now, because the parties have, as we've been discussing,

14   have been discussing a possibility of resolution of their own,

15   and agreed to put this matter off for decision.  That time

16   appears to be passed.

17          The debtors contend that the union's reconsideration

18   motion should be considered under Federal Rule of Civil

19   Procedure 59(e) and Federal Rule of Bankruptcy Procedure 9023.

20   The union disputes that contention but nonetheless does cite

21   some cases in its papers that address motions for

22   reconsideration under Federal Rule of Civil Procedure 59.

23          In any event, the Court finds that the union's motion

24   for reconsideration fails under either Rule 59 or 60.  A court

25   may grant a Rule 59(e) motion to alter or amend a judgment if

1   the movant presents newly discovered evidence that was not

2   available at the time of trial or if the movant points to

3   evidence in the record that clearly establishes a manifest

4   error of law or fact.  See In re Bird, 22 B.R. 229, 235 (Bankr.

5   S.D.N.Y. 1998).  Motions under that rule are used to allege

6   legal error.  United States v. Fiorelli, 337 F.3d 282, 288 (3d

7   Cir. 2003).

8           A motion that calls into question the correctness of a

9   judgment should be treated as a motion under Rule 59(e),

10  however it may be formally styled.  Lyell Theatre Corp. v.

11  Loews Corp., 682 F.2d 37, 41 (2d Cir. 1982).

12          Bankruptcy Rule 9023 requires that a motion to alter

13  or amend a judgment be filed no later than fourteen days after

14  entry of the judgment.  The standard for granting a motion to

15  alter or amend a judgment under 59(e) is "strict", and

16  reconsideration will generally be denied unless the moving

17  party can point to controlling decisions or data that the Court

18  overlooked.  See Analytic Surveys Inc. v. Tonga Partners L.P.,

19  684 F.3d 36, 52 (2d Cir. 2012), that is quoting another Second

20  Circuit decision, Shrader v. CSX Transportation, Inc. 70 F.3d

21  255, 257 (2d Cir. 1995).

22          Moving on to the other applicable rule, Rule 60(b),

23  which is made applicable here by Federal Rule of Bankruptcy

24  Procedure 9024.  It provides that a court may relieve a party

25  from a final judgment, order, or proceeding for the following

1    reasons:  1) mistake, inadvertent surprise, excusable neglect;

2    2) newly discovered evidence that with reasonable diligence

3    could not have been discovered in time to move for a new trial;

4    3) fraud, misrepresentation or misconduct by an opposing party;

5    4) the judgment is void; 5) the judgment has been satisfied,

6    released or discharged, that is it's based on an earlier

7    judgment that's been reversed, vacated or applying it

8    prospectively is no longer equitable; or 6) any other reason

9    that justifies relief.

10          Proper application of Rule 60(b) strikes a balance

11   between serving the ends of justice and preserving the finality

12   of judgments.  It should be broadly construed to do substantial

13   justice.  Final arguments should not lightly be reopened.  See

14   Nemaizer v. Baker, 793 F.2d 58, 61 (2d Cir. 1986).

15          A motion for relief from judgment is generally not

16   favored and is properly granted only upon a showing of

17   "exceptional circumstances", United States v. International

18   Brotherhood of Teamsters, 247 F.3d 370, 391 (2d Cir. 2001).

19   The party seeking relief from judgment bears the burden of

20   proof.  That's from the same United Brotherhood of Teamsters

21   case.

22          A motion to reconsider, whether it's based on Rule 59

23   or 60, may not be used to relitigate an issue already decided,

24   to present new theories, or otherwise take a second bite at the

25   apple.  That's from Tonga Partners, 684 F.3d 52, as well as the

1    Shrader case.  Nor should a motion to reconsider be used as a

2    substitute for a timely appeal.  See Frankel v. ICD Holdings

3    S.A. 939 F.Supp. 1124, 1127 (S.D.N.Y. 1996).

4           Rule 60(b)(1) affords a party relief from a material

5    mistake that changed that changed the outcome of the court's

6    judgment.  Matura v. United States, 189 F.R.D. 86, 89 (S.D.N.Y.

7    1999).  Subsection (b) of Rule 60(b) is considered a catchall

8    provision, but should only be used when no other subsection is

9    applicable.

10          In determining whether a movant has met its burden

11   under (b)(6) relevant considerations include the desire to

12   resolve the dispute on the merits; the existence of a

13   meritorious claim or defense; and the absence of unfair

14   prejudice to the opposing party, if the requested relief is

15   granted.  See Unsecured Claims Estate Representative of

16   Teligent, Inc., v. Cigna Healthcare Inc., 326 B.R. 219, 227

17   (S.D.N.Y. 2005) citing another Southern District of New York

18   bankruptcy case, Rupert v. Krautheimer, 210 B.R. 37, 44 (1997).

19          In this circumstance, the union has, in fact, not

20   identified a material mistake of fact or law, nor has it

21   identified any extraordinary circumstances or extreme -- or

22   undue hardship that would justify vacating the enforcement

23   order.  It does claim that counsel was not afforded sufficient

24   time to respond.  But at the November 6th, 2013 hearing, the

25   union stated it had no objection to DOE making full payments to

1   the debtors in October, November, and December 2013.

2          Counsel for the union at the hearing did not raise any

3   argument at the hearing that would provide a basis for DOE to

4   continue to withhold the money, so the Court's decision was

5   not, in that sense, all that surprising.  In fact, the Court

6   asked if there was any argument the union wished to make but

7   that would require more time to prepare.  The union did not

8   have an answer, but instead merely stated that things were

9   happening very quickly.

10          And in fact, the Court phrased it as follows:  "If I'm

11  hearing something that provides me with essentially an argument

12  that you may need to flesh out that provides a basis for DOE to

13  keep the money, I'm happy to hear it.  If you have that

14  argument, it's one thing, but I'm not hearing that.  I'm

15  hearing that things happened very quickly."  See hearing

16  transcript at page 133.

17          Despite its silence on the issue at the November 6th

18  hearing, the union advances now several theories in their

19  reconsideration motion why the withheld funds were property of

20  the estate.  They present new legal theories without offering

21  any reason why they were not at least raised in some manner in

22  the first instance.  And a union may -- a party may not use a

23  reconsideration motion as a vehicle to relitigate matters

24  already decided.  That's from the Tonga Partners case.

25          While the Court recognizes that its ruling on this

1    issue occurred quickly, the reasons for such speed are

2    explained in the enforcement order itself, and consistent with

3    the Second Circuit's decision in In re Weber, 719 F.3d, (2d

4    Cir. 2013).

5            In any event, the Court finds that the arguments

6    raised now by the union are not persuasive, but will address

7    them in a little bit of detail, given that the original

8    proceedings occurred very quickly and without time for formal

9    briefing.

10           The first and foremost argument that the union asserts

11   is that there was a finding, as required by the EPPs, and it

12   claims that its own determination that the debtors violated the

13   EPPs was sufficient to constitute such a finding.  And this is

14   at the motion at page 9.  The Court is not at all persuaded by

15   that argument, however.

16           It notes that the DOE and the debtors, the parties to

17   the contracts containing the EPPs, both agree there had been no

18   finding.  The DOE and the debtors agree with the notion that

19   for there to be a finding, some sort of final determination is

20   required.  The Court agrees.  While, the Court does not need to

21   exactly determine, either in the original hearing or now, what

22   constitutes a finding under the EPPs, it is clear that it

23   requires something more than the union's unilateral

24   determination that a violation occurred.  In fact, the union's

25   position on this score is fundamentally at odds with the notion

1  of a finding in the first place.

2           The union raises a number of alternative arguments as

3  to why the funds are not property of the estate.  The union

4  claims that the funds are not property because:  1) the funds

5  constitute the res of an express trust in favor of the union;

6  2) the DOE was withholding the funds as an agent for the union;

7  3) that the debtors assigned the funds to the union; and 4)

8  that the funds were impressed with a constructive trust.

9           None of these arguments:  express trust, agency

10 assignment, or constructive trust, is persuasive.  As stated

11 previously, the Court finds that there has been no finding, and

12 each of these theories is, in fact, predicated on the fact that

13 there was a finding.  Moreover, the Union has failed to satisfy

14 the requirements for each of these claims.

15          So as to the first, to establish an express trust, the

16 union must show a designated beneficiary, a designated trustee,

17 designed funds or property, and the actual delivery of the

18 funds by the grantor with the intention of vesting legal title

19 in the trustee.  See Gowan v. Patriot Group, LLC, in the Dreier

20 case, 452 B.R. 391, 420 (Bankr. S.D.N.Y. 2011).

21          The union claims that it was the beneficiary, the DOE

22 the trustee, and the designated funds are those that the DOE

23 was to make available to the union.  The union further claims

24 that the DOE's possession of the funds constitutes delivery,

25 but cites no case law to support that proposition.  The union's

1   only argument regarding intent to vest legal title in the EPP

2   provision -- is the EPP provision, requiring withholding upon a

3   finding.

4          The union further argues that the funds held by the

5   DOE were not property of the estate because a debtor cannot

6   have equitable interest in property it holds in trust for

7   another, but the union's entire argument is that DOE held the

8   funds in trust.  As the DOE makes clear in its own papers, the

9   union has shown neither intent to create a trust between the

10  parties nor delivery by the debtors to the DOE.

11         Moving on to the second theory, the union contends

12  that DOE held the funds as the agent for the union.  Agency is

13  a fiduciary relationship which results from the manifestation

14  of consent of one party to allow another to act on his or her

15  behalf and subject to his or her control and consent by the

16  other, so to act.  See Faith Assembly v. the Titledge of New

17  York Abstract LLC, AD3d 47, 58, (N.Y. App. Div. 2d Dept. 2013).

18         An agency relationship requires manifestation of

19  consent, either express or implied, from the principal to the

20  agent.  See Flame Cut Steel Products Co. v. Performance Foams

21  and Coating Inc. 46 F.Supp.2d 222, 228 (E.D.N.Y. 1999).

22         The union claims that the plain language of the

23  enforcement provision manifests an intention among the Atlantic

24  debtors, the DOE and the union, that DOE act subject to Local

25  1181's control and consent for the funds to be withheld.

1    That's at the motion at page 23.

2              The union hangs its argument on the fact that the

3    enforcement provision states that DOE shall withhold the

4    appropriate amounts, again, something that requires a finding.

5              Moreover, the DOE asserts that it never consented to

6    an agency relationship with the union.  And as the DOE points

7    out, an agency relationship between DOE and the union, could

8    not arise from a contract to which the union was not even a

9    party.  It's unclear how that contract could be a manifestation

10   of the union's consent to an agency relationship where the

11   union was not a party to the contract.

12             Moving on to the third theory, the union argues that

13   the debtors assigned the funds to the union.  An assignment

14   requires a perfected transaction between the assignor and

15   assignee, attended by those parties to vest in the assignee a

16   present right in the things assigned.  See Leon v. Martinez, 84

17   N.Y.2d 83, 88 (1994).

18             And assignment is valid only where the assignor

19   retains no control over the funds or any power to revoke.  See

20   Miller v. Wells Fargo Bank International, 540 F.2d 548 (2d Cir.

21   1976).  The union, in fact, has not shown a perfected

22   transaction by the debtors, intended to divest the debtors of

23   all rights to the withheld funds.

24             Fourth, and finally, a constructive trust, which is an

25   equitable remedy designed to prevent unjust enrichment.  To

1    establish a constructive trust, New York law generally requires

2    that parties show the following elements:  1) a confidential or

3    fiduciary relationship; 2) an express or implied promise; 3) a

4    transfer made in reliance on that promise; and 4) unjust

5    enrichment.  See Weizmann Institute of Science v. Neches (ph.),

6    229 F.Supp.2d 234, 247-58 (S.D.N.Y. 2002).  But the union has

7    not shown any of these elements.

8         The DOE has a contractual obligation to withhold the

9    funds when a finding has been made.  The union is a third-party

10   beneficiary of that contractual obligation.  The union has not

11   supported its claim that the DOE is a fiduciary of the union,

12   nor has it shown in any way that DOE was unjustly enriched

13   under the circumstances here.

14        In sum, the union has not shown any grounds for relief

15   under Rule 59 and 60.  Accordingly the Court denies the union's

16   motion for reconsideration.  The debtors should submit a

17   proposed order stating that the motion is denied for the

18   reasons stated at today's hearing.  And I'd ask that that

19   proposed order be on notice to all parties, so that we can

20   avoid an issue of the order, perhaps, having any unintended

21   consequences.

22        One final note, I note that I -- in addressing these

23   arguments, I'm addressing the papers that have been submitted

24   to me and the evidence that's been submitted to me.  I realize

25   that these parties have relationships outside of the courtroom

1   that I am not privy to.  And that is no doubt more complicated

2   than is reflected in this case.

3         My opinion is not meant to address or change that

4   relationship.  It's simply a reflection of the fact that I

5   don't believe a motion for reconsideration is appropriate here

6   to grant, and that the movant here, the union, has satisfied

7   its burden of proof to receive that relief.

8         So in talking about the various alternative theories,

9   my comments are directed to the information that is the facts

10  and the case law presented to me.

11        So that's my ruling, and if you get me that order in

12  the next five days, that would be great.  All right.  Anything

13  else we need to address here today?

14        MR. KLEINBERG:  Your Honor, are you going to issue

15  your ruling as a written decision?

16        THE COURT:  No, I'm not, not a for a motion for

17  reconsideration.  But I did want to give you the benefit of

18  some detail, given that the issues were addressed in a rather

19  timely fashion --

20        MR. KLEINBERG:  No, I appreciate that.  It's just --

21        THE COURT:  -- time sensitive fashion, I should say,

22  the first time around.  So I'll let the transcript serve as

23  essentially to stand in for a formal written opinion.  But I

24  would say it's about ninety percent there.  But I didn't want

25  to wait to get that out.  All right?

1          Anything else we should address?

2          MS. BECKERMAN:  No, Your Honor.

3          THE COURT:  All right.  Thank you very much.

4          MS. BECKERMAN:  Thank you very much.

5     (Whereupon these proceedings were concluded at 11:03 AM)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                                **I N D E X**

3

4                            **E X H I B I T S**

5    DEBTORS'             DESCRIPTION                         PAGE

6    --                   Declaration of Mr. Johnson            6

7    --                   Declaration of Mr. Dinaburg           19

8

9

10                             RULINGS

11                                       Page    Line

12   Debtors' motion of sale of certain assets    17        4

13   to Factory Direct Bus Sales, Inc. and

14   Quality Bus Service, LLC approved

15   Motion for order directing issuance of       23       10

16   replacement vehicle titles approved

17   Union's motion for reconsideration denied    42       16

18

19

20

21

22

23

24

25

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

1

2                    C E R T I F I C A T I O N

3

4    I, Sharona Shapiro, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8              *Sharona Shapiro*

9

10   _____

11   SHARONA SHAPIRO

12   AAERT Certified Electronic Transcriber (CET**D-492)

13

14   eScribers

15   700 West 192nd Street, Suite #607

16   New York, NY 10040

17

18   Date:  April 5, 2014

19

20

21

22

23

24

25