# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

L & M BUS CORP., B & F SKILLED, INC., HAPPY
CHILD TRANSPORTATIONS LLC, HAPPY DAY
TRANSIT INC., IRIRDIUM SERVICES CORP.,
PENNY TRANSPORTATION INC., SELBY
TRANSPORTATION CORP., SMART PICK, INC.,
GVC LTD, LEESEL TRANSPORTATION CORP.,
MAR-CAN TRANSPORT CO., INC., PHILIP BUS
CORP., 21st AVENUE TRANSPORTATION, CO.,
INC., Y & M TRANSIT CORP., VAN TRANS LLC,
ALINA SERVICES CORP. and MONTAUK STUDENT
TRANSPORT LLC,

                Plaintiffs,

        vs.

BOARD OF EDUCATION OF THE CITY SCHOOL
DISTRICT OF THE CITY OF NEW YORK D/B/A
NEW YORK CITY DEPARTMENT OF EDUCATION,

                Defendant.

Civil Action No.  1:18-cv-1902 (NGG)(SMG)

**DEFENDANT BOARD OF EDUCATION
OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK'S
MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' APPLICATION
FOR AN ORDER TO SHOW CAUSE FOR A TEMPORARY RESTRAINING ORDER**

MORGAN, LEWIS & BOCKIUS LLP
David A. McManus
Melissa D. Hill

101 Park Avenue
New York, NY 10178
Tel.: (212) 309-6000
Fax: (212) 309-6001

*Attorneys for Defendant Board of Education
of the City School District of the City of New
York a/k/a New York City Department of
Education*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ....................................................................................4

ARGUMENT ....................................................................................................6

    I.       INJUNCTION STANDARD.................................................................6

    II.     PLAINTIFFS CANNOT DEMONSTRATE IMMEDIATE
           IRREPARABLE HARM.......................................................................7

          A.    Plaintiffs' Allegations of Harm are Speculative........................8

          B.    The "Harms" Alleged Do Not Satisfy this Court's Standard ...................9

               1.    Plaintiffs' Alleged Monetary Damages Are Not Irreparable..........9

               2.    Plaintiffs' Alleged "Exposure" to "Legal Liability" is not
                    an Irreparable Harm....................................................................11

               3.    Alleged Damage to Plaintiffs' "Business Goodwill" is not
                    an Irreparable Harm....................................................................14

    III.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS
           BECAUSE NEITHER ERISA NOR THE NLRA PREEMPTS THE RFBs .......15

          A.    The RFB is not a "State Law" Subject to ERISA Preemption ................15

          B.    The DOE Plainly Satisfies the Market Participant Exception to
               Both ERISA and NLRA Preemption..........................................17

    IV.    THE BALANCE OF HARDSHIPS TIPS IN THE DOE'S FAVOR, AND
           THE PUBLIC INTEREST WEIGHS IN FAVOR OF DENYING
           PLAINTIFFS' THE DRASTIC REMEDY THEY SEEK ...................................23

CONCLUSION ...............................................................................................24

# TABLE OF AUTHORITIES

                                                                                                    **Page(s)**

**Cases**

*Alameda Newspapers, Inc. v. City of Oakland*,
    95 F.3d 1406 (9th Cir. 1996) ................................................................................................. 19

*Allied Constr. Indus. v. City of Cincinnati*,
    Case Nos. 2016-4248, 2016-4249, 2018 U.S. App. LEXIS 214 (6th Cir. Jan.
    4, 2018) ................................................................................................................................. 19

*Am. Civil Liberties Union v. Clapper*,
    785 F.3d 787 (2d Cir. 2015) ................................................................................................. 6

*Anwar v. Fairfield Greenwich Ltd.*,
    728 F. Supp. 2d 462 (S.D.N.Y. 2010) .................................................................................. 6

*Ass'n of Contracting Plumbers, Inc. v. U.S. EPA*,
    No. 84-1375, 1984 U.S. Dist. LEXIS 18224 (S.D.N.Y. Mar. 27, 1984) ............................... 10

*Associated Builders & Contractors Inc. N.J. Chapter v. City of Jersey City*,
    836 F.3d 412 (3d Cir. 2016) ................................................................................................. 19

*Associated General Contractors of America v. Metropolitan Water District of
    Southern California*,
    159 F.3d 1178 (9th Cir. 1998) .............................................................................................. 16

*Beckwith v. United Parcel Serv., Inc.*,
    889 F.2d 344 (1st Cir. 1989) ................................................................................................ 18

*Bldg. Indus. Electrical Contractors Ass'n v. City of New York*,
    678 F.3d 184 (2d Cir. 2012) ............................................................................................ 20, 21

*Building & Constr. Trades Council v. Associated Builders & Contractors of
    Mass./Rhode Island, Inc.*,
    507 U.S. 218 (1993) ................................................................................... 18, 19, 21, 22

*Cardinal Towing & Auto Repair, Inc. v. City of Bedford, TX*,
    180 F.3d 686 (5th Cir. 1999) ......................................................................................... 19, 20, 22

*Colfax Corp. v. Ill. State Toll Highway Auth.*,
    79 F.3d 631 (7th Cir. 1996) ................................................................................................. 19

*Concerned Home Care Providers, Inc. v. Cuomo*,
    783 F.3d 77 (2d Cir. 2015) ................................................................................................. 17

*Council of the City of N.Y. v. Bloomberg*,
    6 N.Y.3d 380 (2006) ................................................................................... 19, 22

*Dillingham Construction Inc. v. County of Sonoma*,
    190 F. 3d 1034 (9th Cir. 1999) ............................................................................ 18

*eBay Inc. v. MercExchange, LLC*,
    547 U.S. 388 (2006) ......................................................................................... 7, 10

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
    559 F.3d 110 (2d Cir. 2009) ................................................................................... 7

*Glenwood Bridge, Inc. v. City of Minneapolis*,
    940 F.2d 367 (8th Cir. 1991) ............................................................................... 13

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
    481 F.3d 60 (2d Cir. 2007) ..................................................................................... 6

*Healthcare Ass'n of New York State v. Pataki*,
    471 F.3d 87 (2d Cir. 2006) ................................................................................... 21

*Ideavillage Prod. Corp. v. Bling Boutique Store*,
    No. 16-9039, 2017 WL 1435748 (S.D.N.Y. Apr. 21, 2017) ................................ 12

*Johnson v. Rancho Santiago Cty. College Dist.*,
    623 F.3d 1011 (9th Cir. 2010) ............................................................................. 19

*Kamerling v. Massanari*,
    295 F.3d 206 (2d Cir. 2002) ................................................................................... 7

*Legal Aid Society v. City of N.Y.*,
    114 F. Supp. 2d 204 (S.D.N.Y. 2000) ................................................................. 20

*Loft Constructors, Inc. v. Camden Cty. Bd. of Chosen Freeholders*,
    No. 93-5636, 1994 WL 263851 (D.N.J. Jan. 31, 1994) ...................................... 16

*Machinists v. Wisc. Employment Relations Comm'n*,
    427 U.S. 132 (1976) ....................................................................................... 17, 18

*Mazurek v. Armstrong*,
    520 U.S. 968, 117 S. Ct. 1865, 138 L. Ed. 2d 162 (1997) (per curiam) ............... 6

*Moore v. Consol. Edison Co. of New York, Inc.*,
    409 F.3d 506 (2d Cir. 2005) ................................................................................. 10

*Plumbing Industry Bd., Plumbing Local Union No. 1 v. E.W. Howell Co., Inc.*,
    126 F.3d 61 (2d Cir. 1997) ................................................................................... 17

*Parts Distribs., LLC v. City of N.Y.*,
   No. 03-2772, 2003 U.S. Dist. LEXIS 10548 (S.D.N.Y. June 23, 2003) ................................ 24

*Residents & Families United to Save Our Adult Homes v. Zucker*,
   No. 16-CV-1683, 2017 WL 3446805 (E.D.N.Y. Aug. 09, 2017) ...................................... 7, 10

*Rondout Elec., Inc. v. NYS Dep't of Labor*,
   335 F.3d 162 (2d Cir. 2003) ........................................................................................... 17, 18

*Salinger v. Colting*,
   607 F.3d 68 (2d Cir. 2010) ...................................................................................................... 7

*San Diego Bldg. Trades Council v. Garmon*,
   359 U.S. 236 (1959) ............................................................................................................... 18

*Staten Island Bus, Inc. v. N.Y. City Dep't of Educ.*,
   975 N.Y.S.2d 835 (Sup. Ct., N.Y. Cty. 2013) ........................................................................ 5

*Tellock v. Davis*,
   84 F. App'x 109 (2d Cir. 2003) ............................................................................................ 10

*Tom Doherty Assocs. v. Saban Entm't, Inc.*,
   60 F.3d 27 (2d Cir. 1995) .................................................................................................. 7, 14

*Van-Go Transport Co. v. NYC Board of Education*,
   53 F. Supp. 2d 278 (E.D.N.Y. 1999) ............................................................................... 21, 22

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .................................................................................................................... 9

**Statutes**

29 U.S.C. § 1103(c)(2)(A) ........................................................................................................ 10

29 U.S.C. § 1144(a) ............................................................................................................ 15, 17

29 U.S.C. § 1144(c) ................................................................................................................... 16

Employee Retirement Income Security Act of 1974 ........................................................... *passim*

National Labor Relations Act .............................................................................................. *passim*

Wage Parity Act ....................................................................................................................... 17

## PRELIMINARY STATEMENT

On December 29, 2017, the New York City Department of Education ("DOE") issued a bid solicitation for critically important and urgently needed school bus transportation contracts (the "Bid Solicitation" or "RFB") for New York City school students in grades Kindergarten through 12.  The Bid Solicitation is the first of several steps in the lengthy procurement process whereby the DOE will select and ultimately enter into five-year contracts with various bus companies for the provision of school bus transportation services for school children across 1,600 bus routes.  The contracts need to be in place by early August 2018.

Plaintiffs, 17 separate bus companies who presumably are considering submitting bids in response to the RFB, filed this suit on March 29, 2018, seeking a temporary restraining order ("TRO") and preliminary injunction to block the DOE's receipt of bids on April 6, 2018. Plaintiffs ask the Court to immediately halt this critical procurement process, and effectively issue an opinion as to the legality of certain Employee Protection Provisions ("EPPs") contained within the Bid Solicitation.  Doc. 2, Order to Show Cause, at ¶¶ (a)-(b) (requesting declaration that the EPPs are preempted); Doc. 3, Memorandum of Law in Support ("Pl. Mem.").

Fatal to their attempt to secure such a drastic remedy, Plaintiffs cannot meet their burden of demonstrating any irreparable harm, much less immediate irreparable harm, that will result if the Court allows the bids to be received on April 6, and opened on April 9, 2018, as scheduled. In fact, Plaintiffs assert no harm whatsoever that could even possibly occur if they or other companies merely submit bids by the April 6th deadline or the DOE opens the bids on April 9th, or if the DOE then begins the complex and timely process of evaluating bids:  determining the lowest responsible bidders in all 39 classes to be awarded, assessing capacity of the low bidders with respect to each class, and applying an algorithm to determine the combination of awards

that will achieve the lowest overall cost to the DOE.  They do not assert any possible harm if the DOE even moves forward in awarding the contracts. The DOE's Panel for Educational Policy ("Panel") must first approve the awards before the contracts can be submitted to the New York City Comptroller for registration.  The DOE does not believe it is possible to be ready for a Panel meeting for these contracts before the July 25, 2018 Panel meeting.

Therefore, the earliest possible stage at which any Plaintiff could be facing inevitable contract obligations under this RFB is not imminent.  Instead of meeting their burden for a TRO, Plaintiffs paint a picture of a parade of horribles, fashioned entirely on several hypothetical and speculative events: *if* they submit bids, *if* those bids are accepted, *if* they are chosen as the lowest responsible bidders with adequate capacity and are awarded contracts, *if* those contracts are executed; then *if* the facts necessary to trigger the particular aspects of the EPP which they disfavor occur, *then* Plaintiffs *may be* forced to violate the law *if* it is also determined at some point in the future that the EPPs are preempted by federal  law.  If all those uncertain variables come to pass, Plaintiffs say they may have to make payments for pension contributions which they might not be able to get back, and they may lose business goodwill or goodwill with their employees after that point.  Such rank conjecture falls far short of carrying Plaintiffs' burden of establishing immediate irreparable harm here.

Plaintiffs' tale of hypothetical woe also ignores another glaring and indisputable fact: halting the bids and delaying the procurement timetable would cause immediate and irreparable harm to the DOE and the public.  Any postponement to the bid process at this juncture would almost certainly prevent the contracts from being in place by August 2018, leaving no time for the contractors to gear up for service to begin on time for the 2018-2019 school year.  The balance of hardships plainly favors the DOE and the public it serves.

Moreover, and as described in detail below, the DOE issued the Bid Solicitation in December 2017 for the stated purpose of curing the current lack of competition for school-age (grades K-12) bus contracts.  Plaintiffs here are contractors that have current school bus contracts with the DOE; most of them have school-age contracts that are set to expire on June 30, 2018, which will be replaced by the contracts to be awarded under the now challenged RFB.  Plaintiffs would presumably prefer that the DOE extend those contracts yet again rather than face an open and public competition for new contracts.  If the TRO they seek is entered and the procurement process delayed, Plaintiffs will have unjustly achieved their goal in the blink of an eye:  to prevent competition and force extensions of their own contracts.  It will be too late, then, for the Court to undo the harm to the public if this RFB falls off track pending a merits determination.  The balance of hardships, therefore, unquestionably weighs in favor of the DOE.  The public's interest in seeing open and fair competition for these contracts – particularly in light of the problems which have led to the need for the EPPs[1] – plainly favors denying the TRO and allowing the procurement process to move forward while the Court considers the merits of this litigation.

Unable to overcome these practical realities, which should be dispositive here, Plaintiffs spend most of their papers arguing about the alleged illegality of the EPPs, claiming they violate the National Labor Relations Act ("NLRA") and are preempted by the Employee Retirement Income Security Act of 1974 ("ERISA").  Plaintiffs' claims, however, are not likely to succeed on the merits because neither the NLRA nor ERISA preempts the contract specifications set forth in the RFB.

---

[1]    *See* Memorandum from Erin Lester to Chancellor Elizabeth Rose, et al., re New EPP Provisions in Procurements of New K-12 Bus Contract, dated Dec. 26, 2017 ("EPP Memo"), attached to the Declaration of Charlette Hamamgian ("Hamamgian Decl."), Exh. 2.

## STATEMENT OF FACTS

On December 29, 2017, the DOE issued the Bid Solicitation for the provision of citywide

school bus transportation for school-age students with disabilities and others (the "Contract" or

"Contracts"). The Contract is for approximately 1,600 vehicles to begin service in the 2018-19

school year, to be comprised of five-year contracts awarded to multiple vendors in 39 classes of

service. Paragraph 4.5 of the RFB contains the EPPs, which describe bid specifications relating

to the contractors' employees, specifically for seniority hiring priorities, compensation, health

and welfare benefits, and certain rules for honoring pension participation. The DOE held a pre-

bid conference on January 19, 2018 and vendors/potential bidders had until January 24, 2018 to

submit their initial questions. The RFB was amended in certain respects on February 21, 2018,

March 13, 2018, and March 23, 2018. *See* Hamamgian Decl. at ¶¶ 11-12.

Prior versions of the EPPs have a long history in DOE school bus transportation contracts

for K-12 students. In 1979, members of Local 1181-1061 A.T.U. AFL-CIO ("Local 1181"), the

largest union representing school bus workers on DOE contracts, went on strike to protest

omission of certain worker protections from a new request for bids at that time. The strike lasted

for three months and affected more than 80,000 students, including many with disabilities. The

strike ended with a court-ordered settlement that required the 1979 contracts to include EPPs.

The old EPPs established Master Seniority Lists and mandated that new contractors give priority

in hiring to those on the lists at the same wage and benefit levels they had received as employees

with a predecessor contractor. *See* Recommendation of L. Berman in response to Protest, dated

Feb. 23, 2018, at 2 ("Protest Recommendation") (Hamamgian Decl., Exh 1). For the next 30

years, the DOE extended most school bus contracts, all of which contained EPPs, rather than

soliciting new bids, and the labor market remained fairly stable. *Staten Island Bus, Inc. v. N.Y. City Dep't of Educ.*, 975 N.Y.S.2d 835, 838 (Sup. Ct., N.Y. Cty. 2013).

Today, with the specter of labor strikes and withdrawal liability looming large as a result of the DOE's recent efforts to update its school bus contracts,[2] multiple DOE contracts – some with EPPs and some without EPPs[3] – are set to expire on June 30, 2018.  Against the backdrop of expiring contracts, the DOE reviewed information from multiple sources, including existing contract provisions, past RFBs, hearing transcripts, news articles, legal briefs, court decisions, proposed legislation, data summaries, and an expert report about the effects of interrupted school bus access and student absenteeism.  The DOE analyzed the information and determined that the circumstances confronting it in December 2017 supported issuing a bid solicitation with new EPPs to cover the work under the expiring contracts which do not contain EPPs.  *See* Protest Recommendation, at 4-5; EPP Memo, at 16.

Under the current Bid Solicitation, responsive bids must be submitted by this Friday, April 6, 2018.  In order for school bus service to commence under the new contracts with the start of the school year on September 1, 2018, the new contracts must be fully in place no later than early August 2018.  There are many remaining steps to the procurement that will necessarily follow the submission of bids:  first, the DOE needs to review and tabulate the bids that will undoubtedly come in from numerous bidders on the 39 classes being bid out.  Then, in order to determine the "lowest responsible bidder," the DOE will review the low bidders' qualifications and determine each low bidder's capacity, complete background checks, apply an algorithm to

---

[2]     For a more thorough history of the EPPs in the school bus contracts, as well as the associated labor unrest and strike that resulted in 2013 when the DOE issued a RFB omitting the EPPs, the DOE refers to the Court to the EPP Memo.  Hamamgian Decl., Exh. 2, at pp. 3-7.

[3]     Plaintiffs barely acknowledge that any of the current school-age bus routes are conducted under contracts that contain EPP provisions. Such provisions are in fact included in contracts covering approximately 60% of the current routes. EPP Memo, at 2-3.

determine contract awards, submit requests for authorization to enter the proposed contracts to

the Panel for Educational Policy for approval in time for the July 25, 2018 scheduled meeting,

and register the contracts with the New York City Comptroller.  The requests for authorization

must be submitted to the Panel by June 25, 2018 in order for them to be included in the agenda

for the July 25th meeting.  The next Panel meeting after the July 25 meeting does not take place

until August 22, 2018.  Finally, before the Contracts can become effective, they must be

approved by the Office of Management and Budget; and then registered by the Office of the New

York City Comptroller.  Hamamgian Decl. at ¶¶ 14-20.

## ARGUMENT

## I.    INJUNCTION STANDARD

In order to obtain the extraordinary relief they seek, Plaintiffs must prove that (a) they are

likely to suffer immediate irreparable harm in the absence of preliminary relief; (b) they are

likely to succeed on the merits; (c) the balance of equities tips in their favor; *and* that (d) an

injunction is in the public interest.  *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 825 (2d

Cir. 2015).  Like a preliminary injunction, a TRO "is an extraordinary and drastic remedy, one

that should not be granted unless the movant, *by a clear showing*, carries the burden of

persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865, 138 L. Ed. 2d 162

(1997) (per curiam) (emphasis in original) (quotation marks omitted); *see also Anwar v. Fairfield

Greenwich Ltd.*, 728 F. Supp. 2d 462, 472 (S.D.N.Y. 2010) ("Temporary restraining orders and

preliminary injunctions are among 'the most drastic tools in the arsenal of judicial remedies,' and

must be used with great care.") (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d

60, 66 (2d Cir. 2007)).

## II.   <u>PLAINTIFFS CANNOT DEMONSTRATE IMMEDIATE IRREPARABLE HARM</u>

At the outset, Plaintiffs cannot demonstrate that they are likely to suffer "irreparable

harm" if the Court does not award a TRO (or preliminary injunction).  "A showing of irreparable

harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'"

*Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal citation

omitted).  To demonstrate it is entitled to injunctive relief, a moving party must show that the

injury is likely before the other requirements for an injunction will be considered.  *Kamerling v.*

*Massanari*, 295 F.3d 206, 214 (2d Cir. 2002).  Further, to qualify for the extraordinary remedy of

preliminary injunctive relief, plaintiff must establish that the threatened injury is "not remote or

speculative[,] but actual and imminent."  *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27,

37 (2d Cir. 1995).  As this Court has noted, "[a] TRO, perhaps even more so than a preliminary

injunction, is an extraordinary and drastic remedy, one that should not be granted unless the

movant, by a clear showing, carries the burden of persuasion."  *Residents & Families United to*

*Save Our Adult Homes v. Zucker*, No. 16-CV-1683, 2017 WL 3446805 (E.D.N.Y. Aug. 09,

2017) (internal quotation marks and citations omitted).

Courts may not presume irreparable harm; "[r]ather, plaintiffs must show that, on the

facts of their case, the failure to issue an injunction would actually cause irreparable harm."

*Salinger v. Colting*, 607 F.3d 68, 82 (2d Cir. 2010).  To do so, "the court must actually consider

the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately

prevails on the merits, paying particular attention to whether the 'remedies available at law, such

as monetary damages, are inadequate to compensate for that injury.'"  *Id.* at 80 (quoting *eBay*

*Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)).

Plaintiffs allege that the following injuries may *possibly* befall them *if* they choose to bid,

*if* that bid is successful, *if* they are awarded one of the contracts at issue, and *if* the contract

awards are approved: (1) Plaintiffs *may* make monetary contributions to plans or pension funds "that are likely unrecoverable;" (2) Plaintiffs *may* be exposed to "legal liability"; and (3) that the operation of certain terms of the contract *may* cause "damage [to] Plaintiffs' business goodwill." *See* Pl. Mem. at p. 28.  Plaintiffs have not presented the Court with any evidence – let alone evidence to make the requisite "clear showing" – of the likelihood that they may be injured by any of these alleged "harms."  These injuries are highly conclusory, speculative, and otherwise fail to meet the irreparable harm standard – even if they could conceivably occur upon the mere receipt of bids and opening of bids which is what they seek to enjoin with a TRO.

### A. Plaintiffs' Allegations of Harm are Speculative

None of the Plaintiffs alleges that it actually has thus far submitted a bid to the DOE, yet all of the alleged "harms" relate to damages that might occur *only if* Plaintiffs are the successful bidders and are awarded the contracts at issue.  Before the Court can even begin to consider the nature of the alleged harms, it must make the following assumptions:

1) Plaintiffs will each submit bids to the DOE;
2) Plaintiffs' bids will be low bids in particular classes;
3) Plaintiffs will be found to have capacity for at least one class they bid on;
4) Plaintiffs will be found to be "responsible bidders" by the DOE;
5) Plaintiffs will be found to be among the awardees, after application of an algorithm, which will provide the DOE with the lowest overall cost for all 39 Classes;
6) Plaintiffs' contracts will be approved by the Panel for Education Policy;
7) Plaintiffs' contracts will be approved by the Office of Management and Budget; and,
8) Plaintiffs contracts will be registered by the Office of the Comptroller.

Hamamgian Decl. at ¶¶ 14-20.

The speculative nature of these allegations is emphasized by the conditional language Plaintiffs use throughout their memorandum to describe the alleged injuries.  *See* Pl. Mem. at p. 25 (speculating that "employee composition *may* change") (emphasis added); p. 26 (positing that entering into a new contract "*could potentially destroy*" Plaintiffs' business reputation)

(emphasis added); p. 27 (arguing that "*if* Plaintiffs enter into the Contract, they *may be required* . . . to make contributions to employees' prior pension funds," and if the Court later finds in Plaintiffs' favor on the merits, then Plaintiffs "*are likely unable*" to recover such funds) (emphasis added); p. 28 (hypothesizing that, if they are awarded the Contract, Plaintiffs "*potentially*" may have to participate in the management of the funds, or face "*potential*" withdraw liability) (emphasis added); p. 28, n.11 ("*If* Plaintiffs win bids . . . *may* force Plaintiffs into further litigation") (emphasis added).  These attenuated, highly speculative circumstances are not the kinds of harms preliminary injunctive relief is meant to protect against.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").

> **B.      The "Harms" Alleged Do Not Satisfy this Court's Standard**

Should the Court find reason to disregard the unsupported, speculative nature of Plaintiffs' Application, and also disregard that no harm whatsoever could even possibly result from the mere receipt and opening of bids, it nevertheless must deny Plaintiffs' request for a TRO because the nature of the "harms" alleged does not satisfy the irreparable harm standard articulated by the Second Circuit.

> **1.      Plaintiffs' Alleged Monetary Damages Are Not Irreparable**

The first "harm" that Plaintiffs claim is that "entering into the contract will force Plaintiffs to make monetary contributions to plans or funds that are likely unrecoverable." *See* Pl. Mem. at p. 25.  Relatedly, Plaintiffs complain that, if they are awarded a contract under the RFB, they will be "forced to create a complex administrative scheme" to comply with the EPP Provision.  It is well-settled law – in this Circuit and, indeed, throughout the federal judiciary –

that monetary damages are not irreparable harms. *See eBay Inc.*, 547 U.S. at 391 (an award of

injunctive relief requires, among other things, that plaintiff demonstrate "that remedies available

at law, such as monetary damages, are inadequate to compensate for that injury").[4] Plaintiffs'

alleged monetary harms – either in lost pension contributions or in the administrative costs

associated with making those contributions[5] – are clearly compensatory in nature and, therefore,

not irreparable.

Indeed, Plaintiffs concede a means by which they could recover any contributions made

to a pension plan if the Court were to later invalidate the EPPs contained in a hypothetical

contract – *i.e.*, by petitioning for a return of the money pursuant to 29 U.S.C. § 1103(c)(2)(A),

which provides for recovery from a fund if the contributions were made by mistake of law or

fact. *See* Pl. Mem. at p. 27. Plaintiffs provide no support for their claim that an "arbitrary and

capricious" standard is an "incredibly high burden" to recovery under § 1103(c)(2)(A). Surely, a

---

[4]    *See also Moore v. Consol. Edison Co. of New York, Inc.*, 409 F.3d 506, 510 (2d Cir.
2005) ("Where there is an adequate remedy at law, such as an award of money damages,
injunctions are unavailable except in extraordinary circumstances."); *Tellock v. Davis*, 84 F.
App'x 109, 112 (2d Cir. 2003) ("[A]ny injury to [plaintiff] can be compensated by money
damages . . . Thus, [plaintiff] has not demonstrated that he will suffer an imminent and
irreparable injury absent the injunction."); *Residents & Families United to Save Our Adult
Homes v. Zucker*, No. 16-1683, 2017 WL 3446805, at *2 (E.D.N.Y. Aug. 10, 2017) (Garaufis, J.)
("except in 'extraordinary circumstances,' injunctions are unavailable where 'there is an
adequate remedy at law, such as an award of money damages.'") (internal citation omitted);
*Ass'n of Contracting Plumbers, Inc. v. U.S. EPA*, No. 84-1375, 1984 U.S. Dist. LEXIS 18224, at
*11 (S.D.N.Y. Mar. 27, 1984) ("[P]laintiffs cannot prevail in any event because they cannot
establish irreparable harm. Theirs is solely an economic interest -- attenuated at best since there
is no assurance that if the bidding procedures began anew on Contract 6A, that either will be the
successful bidder.").

[5]    Given many of the Plaintiffs' longstanding presence in this industry, it is hard to accept
Plaintiffs' apparent contention that they have no current administrative system in place that is
capable of processing paperwork from its employees and forwarding payments to the various
plans and funds to which its current workforce belongs. In any event, the cost associated with
creating such a system is quantifiable and, therefore, if any claim arising out of such
circumstances were actionable, would be compensable if Plaintiffs ultimately prevail on the
merits of their claims.

judicial determination that the contributions were made in violation of the law would qualify under this standard.[6]

### 2. Plaintiffs' Alleged "Exposure" to "Legal Liability" is not an Irreparable Harm

Plaintiffs next argue that if they are awarded the Contracts, they will somehow be "exposed to legal liability." *See* Pl. Mem. at p. 25. The nature of these alleged "liabilities" is not clear. Plaintiffs refer to an unspecified "impact" that a change in their "employee composition" may have on their "current CBAs" and to "wrongful termination" lawsuits from employees. Plaintiffs also claim that, *if* the EPPs are found to be violative of federal law, the mere fact of entering into the Contract (if and when that might come to pass) would cause irreparable harm. These contentions have no merit.

Plaintiffs' apparent reading of the EPPs to somehow require that they terminate their current workforce ignores that their employees who have been working on current contracts are going to lose their jobs on June 30, 2018 as a result of the contracts expiring. No employees have an expectation of continued service of routes under an expiring contract. And it cannot be assumed that Plaintiffs will necessarily win new Contracts; there are many potential bidders that do not currently service the routes up for bid. Moreover, Plaintiffs are misreading the terms of the RFB. Plaintiffs' employees who are currently serving routes that are not up for bid (i.e., on contracts that are not the ones expiring before the start of the next school year, which are being

---

[6]      To find that this alleged "harm" satisfies the standard, the Court must also assume that Plaintiffs are likely to make contributions into a plan or fund which will later be deemed erroneous, that Plaintiffs will then seek to recover their contribution and will be rebuffed by the plan or fund, that Plaintiffs will petition a Court to reverse the plan's or fund's decision, and that the Court will find in the plan's or fund's favor (notwithstanding that this whole scenario is contingent upon a federal court first finding, in a final decision, on the merits, that the EPPs are preempted by federal law). Such circumstances are, by any definition of the words, "remote" and "speculative," not "actual" or "imminent."

11

replaced by the new RFB Contracts) would not be affected by the EPPs in the RFB at all.  If Plaintiffs are awarded a Contract on routes that they are not currently servicing, Plaintiffs would need to hire new employees to service those routes, in any event, regardless of whether the new Contract contains EPPs.  If Plaintiffs are currently servicing the routes up for bid, and if Plaintiffs are not awarded a new contract for those routes, Plaintiffs will have to resolve the question of what to do with their employees regardless of whether the new Contracts contain EPPs.  If Plaintiffs are awarded a new Contract for routes that they currently service, it is logical, given how the seniority lists operate, to conclude that the employees currently servicing those routes will be likely to have the chance to select to work for the same employers they had before.

Plaintiffs also do not explain how any alleged change in their workforce composition will have an "impact" on any collective bargaining agreements, nor do they explain how such 'impact' would "expose" Plaintiffs to any legal liabilities.  *See* Pl. Mem. at p. 25.  Plaintiffs similarly fail to explain the grounds by which their current employees could assert "wrongful termination" claims against them.  As noted above, there is no requirement in the RFB that Plaintiffs terminate their employees on other contract work that is not expiring and the workers on the current contracts that are being replaced are losing their jobs because the current contracts are expiring.  It is illogical to claim that hypothetical future changes in their workforce – which in any event could not possibly occur until long after April 6th and 9th – constitute an imminent and actual threat to Plaintiffs necessitating a TRO to stop the bidding on those dates.

Plaintiffs' legal argument that "legal liability" constitutes irreparable harm rests on a single case that is distinguishable on a number of grounds, not the least of which being that the plaintiffs in that action supported their claims of harm with sworn declarations supported by documentary evidence.  *See Ideavillage Prod. Corp. v. Bling Boutique Store*, No. 16-9039, 2017

WL 1435748, at *4 (S.D.N.Y. Apr. 21, 2017).  A review of the docket in that case reveals that

the plaintiffs submitted three witness declarations with voluminous exhibits in support of their

application.  Further, the plaintiffs in that action sought to enjoin the defendants from continuing

to manufacture and sell counterfeit medical supplies.  The danger to the public and the potential

legal liability to the plaintiffs that would arise from any injury related to the use of such products

is facially obvious.  The likelihood of litigation against Plaintiffs here if the bid process is

allowed to proceed is far from apparent.

       Plaintiffs make a related argument that they are threatened with irreparable harm because

they may be placed in the "untenable position" of entering into a contract that potentially violates

federal law.  *See* Pl. Mem. at p. 28.  In other words, they argue that because the Court may

eventually rule in Plaintiffs' favor, it must enjoin the DOE's conduct immediately.  This

argument impermissibly conflates the "likelihood of success" prong with the "irreparable harm"

prong of the injunctive relief standard.  The sole case on which Plaintiffs rely on for support of

this argument– *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371 (8th Cir. 1991)

– cites to no precedent in support of its holding that protecting an "interest in participating in a

legal bidding process and ensures that the contract awarded will be a legal one" is sufficient to

establish irreparable harm.  *See Glenwood Bridge*, 940 F.2d at 372.  The DOE is not aware of

any court in the Second Circuit applying such a standard or citing favorably to the Eighth

Circuit's analysis in *Glenwood Bridge*.[7]  For the reasons discussed further below, Plaintiffs here

---

[7]      Further, the Eighth Circuit in *Glenwood Bridge* found that the plaintiff in that action "present[ed] a sufficiently strong case of federal preemption by the NLRA, however, that we think [the likelihood of success] factor rests heavily in its favor" and based its award of preliminary injunctive relief largely on this finding.  *See Glenwood Bridge*, 940 F.2d at 371.  For the reasons discussed further below, Plaintiffs here cannot demonstrate a likelihood of success on the merits of any of their underlying claims.

cannot demonstrate a likelihood of success on the merits of any of their underlying claims.

Further, adoption of Plaintiffs' argument as sufficient to satisfy the irreparable harm prong would

allow every plaintiff to obtain preliminary injunctive relief at the outset of every litigation simply

by relying on their presentation of their underlying claims.  Such a ruling would not comport

with the long-held notion that a TRO is an extraordinary remedy.

### 3. Alleged Damage to Plaintiffs' "Business Goodwill" is not an Irreparable Harm

Finally, Plaintiffs claim that a TRO and/or a preliminary injunction is necessary to

prevent "damage to Plaintiffs' business goodwill in the industry and with their own employees."

*See* Pl. Mem. at p. 25.  To establish "loss of goodwill" as an irreparable harm, the Second Circuit

requires a "clear showing" of such loss.  *See Tom Doherty Assocs.*, 60 F.3d at 38 (further holding

that the Circuit expects the "clear showing" standard to be "infrequently met").  In support of

their claim that their "goodwill" will be damaged if the bidding process is not immediately

enjoined, Plaintiffs ask the Court to rely only on the conclusory statements in their memorandum

of law to support a finding of irreparable harm.  Plaintiffs argue that if they are unable to select

the drivers of their choice, their business reputations will be "potentially destroy[ed]."  *See* Pl.

Mem. at p. 26.  This argument ignores the fact that the client they are servicing – the DOE – is

the entity administering the seniority list.  The DOE does not intend to populate that list with

individuals that are not qualified to service the contracted routes.  *See Second Amended*

*Questions & Answers-Round 1* (Hamamgian Decl., Exh. 5) at #16 ("The Department requires

that all school bus drivers and attendants maintain the appropriate certifications.") and #25

("[The seniority lists] will be maintained by the Department's Office of Pupil Transportation

(OPT).  OPT will determine eligibility for the Lists, add School Bus Workers to the Lists as

appropriate and confirm that School Bus Workers are up to date with eligibility requirements.").

14

Plaintiffs also fail to explain how continuing to provide contributions to an employee's current or prior plan will cause Plaintiffs to lose standing with those employees. *See* Amendment No. 2 to Bid Solicitation (Hamamgian Decl., Exh. 4) at ¶ 6(4) ("Any ESBW Hiree who has not participated in a defined benefit pension plan or exercises his or her option to withdraw from the applicable Prior Plan shall not be required to participate in any such plan or fund but may participate in the collective bargaining agreement, if any, of his or her employer.")  Accordingly, Plaintiffs have not made a "clear showing" that adoption of the EPPs in the new contracts will cause irreparable damage to their "business goodwill."

In sum, Plaintiffs have failed entirely to establish that a TRO or preliminary injunction is necessary to prevent any of the Plaintiffs from suffering harm, let alone immediate irreparable harm while their motion for a preliminary injunction is considered or during the pendency of this litigation.  Accordingly, the Court should deny Plaintiffs' Application and allow the status quo to continue and the parties to litigate the merits expeditiously, and simultaneously with the initial procurement steps that need to occur without delay if these Contracts are to be a possibility. Granting a TRO would essentially decide the case for Plaintiffs before the DOE has had a chance to present its defense on the merits.

## III.  PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS BECAUSE NEITHER ERISA NOR THE NLRA PREEMPTS THE RFBs

### A.  The RFB is not a "State Law" Subject to ERISA Preemption

As a threshold matter, Plaintiffs cannot succeed on their claim that ERISA preempts the RFB because ERISA preempts only "state laws" and the RFB is not a state law.  Section 514(a) of ERISA provides that ERISA "shall supersede any and all *State laws* insofar as they may now or hereafter relate to any employee benefit plan" described elsewhere in the statute.  29 U.S.C. § 1144(a) (emphasis added).  "State laws" for purposes of Section 514(a) include "all laws,

decisions, rules, regulations, or other State action having the effect of law, of any State."  29

U.S.C. § 1144(c).

Under this definition, ERISA's preemption provisions apply only to generally enacted

laws and regulations.  *See Minn. Chapter of Associated Builders & Contractors*, 825 F. Supp.

238, 243 (D. Minn. 1993) (ERISA's definition of "State laws" excludes state action which does

not have the effect of law).  ERISA preemption plainly does not reach actions taken by the

"State" where the state "acts purely as a proprietor."  *Id*.  Given that the challenged RFB does not

have the force of law, ERISA's preemption provisions in Section 514(a) simply do not apply.[8]

*Id*. (ERISA Section 514(c) "excludes state action which does not have the effect of law, and

ERISA therefore does not preempt state action which relates to an ERISA plan so long as the

state action does not have the effect of law.")  *See also Associated General Contractors of*

*America v. Metropolitan Water District of Southern California*, 159 F.3d 1178 (9th Cir. 1998)

(holding that ERISA did *not* preempt a project labor agreement ("PLA") because PLA did not

constitute "rules, regulations or other action . . . having the effect of law; instead, "apparent that

PLA contains "mere negotiated contract provisions demanded for certain projects" that reflect an

owner's desire to contractually assure peace and prosperity on particular projects.); *Loft*

*Constructors, Inc. v. Camden Cty. Bd. of Chosen Freeholders*, No. 93-5636, 1994 WL 263851,

at *19 (D.N.J. Jan. 31, 1994) (provision in project agreement calling for union employees and

fringe benefits not preempted; "This court agrees with the view that ERISA preserves the

distinction between state regulation and non-regulatory state activity, and further that ERISA

preempts state action only where the state entity is exercising a regulatory function.").

---

[8]     In their Brief, Plaintiffs try to latch on to a local law that requires the DOE and the New
York City Chancellor to *develop and use a procurement policy* when awarding contracts."  Pl.
Mem. at p. 21.  The DOE's "policy" is not at issue here, but rather the terms and conditions of
the RFB covering a discrete area of New York City's public school administration.

As with the contract in *Minnesota Chapter*, the RFB challenged here applies to only a discrete project – this current RFB covers only a portion of the DOE's school-age (K-12) bus routes, and none of its pre-Kindergarten/Early Intervention bus routes. *See* 825 F. Supp. at 243 (noting that bid specification that applies only to a discrete project does and not apply to other projects in County is earmark of "proprietary" conduct). Moreover, any private party could insist on specific contract terms that would preserve labor peace and address problems of contractors' pension withdrawal liability, similar to a stated goal of the DOE to lessen the risk of work stoppages among affected employees and to address withdrawal liability. Finally, the EPP provisions lack force of law. As such, the DOE's proprietary actions expressed in the RFB are not "state laws" within the meaning of ERISA Section 514(c) and Plaintiffs are not likely to succeed on their ERISA preemption claim.[9]

## B. The DOE Plainly Satisfies the Market Participant Exception to Both ERISA and NLRA Preemption

The Supreme Court generally employs two distinct doctrines to determine whether a state law is preempted by federal labor law. *See Rondout Elec., Inc. v. NYS Dep't of Labor*, 335 F.3d 162, 167 (2d Cir. 2003). The first doctrine – the so-called *Machinists* doctrine – proscribes state

---

[9]  Nor do the challenged EPPs "relate to" an employee benefit plan as necessary for ERISA preemption to apply. 29 U.S.C. § 1144(a). The Second Circuit holds that a state law "refers to" ERISA plans if it "acts immediately and exclusively upon ERISA plans" or where "the existence of ERISA plans is essential to the law's operation. *Plumbing Industry Bd., Plumbing Local Union No. 1 v. E.W. Howell Co., Inc.*, 126 F.3d 61, 67 (2d Cir. 1997). In addition, a state law may be preempted if it has a clear "connection with" a plan and "mandate[s] employee benefit structures or their administration" or "provid[es] alternative enforcement mechanisms." *Id.* Under this standard, the requirement in the EPPs to pay a certain minimum compensation, benefit, and pension contributions in certain circumstances, is not preempted by ERISA. *See Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77 (2d Cir. 2015) (approving arrangement regarding minimum benefits due under Wage Parity Act). Moreover, the RFB provisions do not refer to or have a connection with a specific plan. Instead, the provisions merely accommodate any applicable pension plans of the employees, and the DOE is not dictating what plans, if any, a contractor must provide.

regulation of conduct that Congress intended to remain unregulated. *See Machinists v. Wisc. Employment Relations Comm'n*, 427 U.S. 132 (1976). According to the *Machinists* doctrine, Congress intended for certain aspects of the labor-employment relationship "to be controlled [only] by the free play of economic forces." *Fort Halifax Packing Co.*, 482 U.S. 1, 20 (1997) (quoting *Machinists*, 427 U.S. at 140). As the Second Circuit has explained, under this doctrine:

> [s]tates may not deny [] one party to an economic contest a weapon that Congress meant him to have available . . . Thus state action is only preempted if it regulates the use of economic weapons that are recognized and protected under the [National Labor Relations Act ("NLRA")] such that the state or local government has entered "'into the substantive aspects of the bargaining process to an extent Congress has not countenanced.'" . . . There are two general exceptions to the *Machinists* doctrine: first, if the state regulation works to establish minimum substantive labor standards that are consistent with the legislative goals of the NLRA, . . . and ***second, if the state is a market participant or proprietor.***

*Rondout*, 335 F.3d at 167 (internal citations omitted) (emphasis added).[10]

Critical – and fatal – to Plaintiffs' preemption challenge is the market participant exception to both the NLRA and ERISA. Specifically, the Supreme Court in *Boston Harbor* distinguished between, on the one hand, state action that actually regulates and, on the other hand, action where the state is merely a "market participant," finding NLRA preemption principles apply only where the state acts as a regulator, but not when the state acts as a market

---

[10]     The second doctrine is called *Garmon* preemption. *See San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959). According to the *Garmon* doctrine, the NLRA preempts state jurisdiction over activity that is arguably protected or prohibited by the NLRA. *See generally Beckwith v. United Parcel Serv., Inc.*, 889 F.2d 344, 346 (1st Cir. 1989). To the extent the EPPs are challenged for setting minimum wage and benefit rates, preemption does not apply. *See Dillingham Construction Inc. v. County of Sonoma*, 190 F. 3d 1034, 1040-41 (9th Cir. 1999) (rejecting argument that the NLRA preempted apprenticeship prevailing wage law requiring payment of journeyman wages to employees in apprenticeship programs without state approval but allowing payment of lower apprenticeship wages to employees in state approved programs, finding minimum labor standards do not disrupt the collective bargaining process because minimum labor standards treat all workers – both union and non-union – alike, and they neither encourage nor discourage collective bargaining).

participant. *Building & Constr. Trades Council v. Associated Builders & Contractors of Mass./Rhode Island, Inc.*, 507 U.S. 218, 226-27 (1993) ("*Boston Harbor*").[11]  Simply put, "when a state or municipality acts as a participant in the market and does so in a narrow and focused manner consistent with the behavior of other market participants, such action does not constitute regulation subject to preemption." *Cardinal Towing & Auto Repair, Inc. v. City of Bedford, TX*, 180 F.3d 686, 691 (5th Cir. 1999) (citations omitted).  Thus, a threshold issue to any preemption analysis requires determining whether the state action at issue involves the regulation of labor relations or something else.  *See*, *e.g.*, *Alameda Newspapers, Inc. v. City of Oakland*, 95 F.3d 1406, 1413 (9th Cir. 1996).[12]

The so-called *Boston Harbor* inquiry has been reduced to two questions: "[1], does the challenged action essentially reflect the entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances? [and 2], does the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem?" *Cardinal Towing*, 180 F.3d at 693.  As the Fifth Circuit has explained:

---

[11]     Although the Second Circuit has yet to address the issue directly, several courts, including recently the Sixth Circuit, have applied the market participant exception to ERISA preemption as well.  *See Allied Constr. Indus. v. City of Cincinnati*, Case Nos. 2016-4248, 2016-4249, 2018 U.S. App. LEXIS 214, at *9 (6th Cir. Jan. 4, 2018).  *See also Johnson v. Rancho Santiago Cty. College Dist.*, 623 F.3d 1011, 1023-24 (9th Cir. 2010); *Associated Builders & Contractors Inc. N.J. Chapter v. City of Jersey City*, 836 F.3d 412, 417 (3d Cir. 2016).  In addition, the Court of Appeals of New York has upheld use of the market participant analysis under ERISA in *Council of the City of N.Y. v. Bloomberg*, 6 N.Y.3d 380 (2006).

[12]     Because the NLRA contains no express preemption provision, "courts are reluctant to infer preemption." *Colfax Corp. v. Ill. State Toll Highway Auth.*, 79 F.3d 631, 634 (7th Cir. 1996).  As such, labor law preemption is "not found unless an action conflicts with federal law or would frustrate the federal scheme, or unless it is clear from the totality of the circumstances that Congress intended to occupy the field." *Id.*  None of these conditions are present here.  As such, the DOE's actions during the contract bid process are not preempted.

> Most government contracting decisions do not constitute concealed
> attempts to regulate, however.  In order to function, government
> entities must have some dealings with the market.  While the
> leverage a state can exert through its spending power and the
> absence of a true profit motive to restrain government action may
> create a temptation to take advantage of these interactions to
> pursue policy goals, the presence of the state in the market cannot
> automatically be assumed to be motivated by a regulatory impulse,
> Given the volume of, and obvious need for, interaction between the
> government and the private sector, the application of preemption in
> a manner that hobbles state and local government's purchasing
> power threatens severe disruption.

*Id* at 692.

In support of their argument that the market participant exemption does not apply,
Plaintiffs point to a handful of provisions found in the RFB which they characterize as "atypical
of contract terms found in contracts between private parties in similar circumstances."  Pl. Mem.
at p. 17.  Without any further support, Plaintiffs then conclude that the "market participant"
exception does not apply to the DOE.  Plaintiffs' failure to offer any authority beyond this is
fatal, and confirms Plaintiffs' inability to prevail on the merits.

For starters, rather than address the merits, Plaintiffs spend a great deal of time alleging
that the DOE is somehow in cahoots with Local 1181 and helping push that Union's agenda
during this process.  When doing so, Plaintiffs ignore that "the subjective motive of a state actor
is irrelevant to [the] preemption analysis, which instead is guided by the objective effects of state
action in relation to the federal scheme."  *Legal Aid Society v. City of N.Y.*, 114 F. Supp. 2d 204,
237 (S.D.N.Y. 2000).  Indeed, "courts have gauged the extent of preemption by the objective
effects of the challenged state action, looking to see whether the action functions to promote a
particular labor policy in general or else to serve legitimate proprietary needs within a more
discrete setting."  *Id.  See also Bldg. Indus. Electrical Contractors Ass'n v. City of New York*, 678
F.3d 184, 192 (2d Cir. 2012) ("BIECA") ("It is hard to see why, even if political favoritism was

a motivating factor in the City's decision to contract with particular contractors or unions, the PLAs would thereby be transformed from contracts into *regulations*.") (emphasis in original).

According to the Second Circuit, "[i]n the absence of an express or implied indication that a State may not manage its own property when it pursues its purely proprietary interests, and where analogous private conduct would be permitted, this Court will not infer such a restriction," (i.e., a finding that a state was acting as a regulator). *Healthcare Ass'n of New York State v. Pataki*, 471 F.3d 87, 108 (2d Cir. 2006) (*quoting Boston Harbor*, 507 U.S. at 231-232). Here, the handful of factors Plaintiffs point to in their effort to find NLRA preemption in fact do nothing to disturb the fact that the DOE continues to act as a market participant. Moreover, the effects that Plaintiffs complain of – restaffing bus company employee rosters; maintaining and updating seniority lists; setting minimal contribution and health benefits contribution amounts; and allowing employees to remain in, or rejoin, their prior pension plan, Pl. Mem. at p. 17-18 – are entirely ordinary consequences of contract awards in the public or private sector, creating winners and losers among contractors who seek to bid on a project. *BIECA,* 678 F.3d at 190. Moreover, when acting as a market participant, the DOE need not show that its contracts are "maximally efficient." *Id*. at 191. Instead, all the DOE need show is that it is pursuing a business decision, even one that raises concerns about the efficacy of the DOE's contract process itself. *Id*. at 192. Plaintiffs may not like the new requirements, but they are free to change their mode of operation in order to bid, or seek business opportunities that do not include the terms and conditions the DOE has set for these Contracts. *See Boston Harbor*, 507 U.S. at 231.

Plaintiffs' reliance on *Van-Go Transport Co. v. NYC Board of Education*, 53 F. Supp. 2d 278 (E.D.N.Y. 1999) is misplaced. There, the Board of Education refused to conditionally certify replacement workers to fill the jobs of school bus employees on strike, and then adopted a

blanket rule limiting the percentage of conditional certifications that could be granted to any

company.   *Id.* at 288.  As the *Cardinal Towing* court noted, "courts usually find preemption

when government entities seek to advance general societal goals rather than narrow, proprietary

interests through the use of their contracting power." 180 F.3d at 692.  The *Van-Go* facts

certainly fit in the "advancement of goal" category, for the conduct at issue was found to be

intended to ban strike breakers and therefore limit contractors' ability to provide DOE with

needed bus service, and unlike here, there was no pre-decisional analysis of proprietary goals.

*See Van-Go*, 53 F. Supp. 2d at 288-290; *cf.* EPP Memo.

   The same can be said about the court's decision in *New York City Council v. Bloomberg*

on which Plaintiffs also rely.  In *Bloomberg*, the City Council attempted to recast its Equal

Benefits Law as the product of market participation designed to identify firms the City would do

business with based on the benefits those firms provided their employees.  6 N.Y.3d at 394.  The

New York State Court of Appeals rejected this attempt:

> The Equal Benefits Law is much more like the statute involved in
> [*Wisconsin Dept. of Industry v.*] *Gould*[, 475 U.S. 282 (1986)] than
> the contract specification at issue in *Boston Harbor*. In enacting
> the Equal Benefits Law the Council was obviously "setting
> policy." As we pointed out above, it was not acting just as a
> manager or owner of property concerned with assuring the cheap
> and efficient performance of contracts. The Equal Benefits Law, as
> its name implies, is designed to induce contractors to treat
> domestic partners and spouses equally, just as the Wisconsin
> statute in *Gould* was designed to induce contractors to avoid unfair
> labor practices. Thus the market participant exception does not
> apply here, and the Equal Benefits Law, except to the extent that
> the benefits it governs are not provided through ERISA plans, is
> preempted by ERISA.

*Id.* at 395.  In contrast, here the purpose of the EPP in this RFB is not to advance a social policy;

but, rather, to allow for competition, foster labor peace, attract and retain employees, modernize

contract terms, and help contractors manage foreboding withdrawal liability exposure that many

companies may face.  These are not societal goals; rather, the EPPs in this RFB are a necessary and vital step for the DOE to take in the commercial market so that the delivery of school bus services can continue in a healthy, uninterrupted manner.  As such, the DOE acts as a market participant here and thus is free from preemption under the NLRA or ERISA.

## IV. THE BALANCE OF HARDSHIPS TIPS IN THE DOE'S FAVOR, AND THE PUBLIC INTEREST WEIGHS IN FAVOR OF DENYING PLAINTIFFS' THE DRASTIC REMEDY THEY SEEK

Finally, Plaintiffs cannot meet their burden of establishing both that the balance of hardships tips in their favor, or that public interest weighs in favor of an injunction.  Quite the contrary.  As noted above, most of the Plaintiffs in this case have current contracts with the DOE – without EPPs – set to expire on June 30, 2018.  If allowed to go forward, the Bid Solicitation will ultimately replace those contracts with new contracts awarded under the competitive bid process Plaintiffs now challenge.

Plaintiffs frame the present challenge as one to prevent the DOE from moving forward with bid specifications they claim are illegal under federal law.  Pl. Mem. at pp. 2, 30.  But Plaintiffs clearly have a self-interest at stake here:  a concern in the short term that their contracts will be competed through an open and public bidding process instead of simply extended, and in the long term, that if there is competition someday, they will lose their current perceived competitive advantage over the contractors still running 60% of the routes under old EPP contracts.  *Id.* at p. 30 (suggesting that the DOE could extend the expiring contracts instead of putting them out to bid).

Indeed, Plaintiffs glibly assert that if they are granted an injunction, the contracts could be amended and re-bid, all before the start of the school year in just a few months.  (*Id.*) Plaintiffs make the wholly unfounded and illogical assumption that the entire procurement process could start over from the top, at some point in the future, and wrap up cleanly before

23

school starts in September.  The bold and unsupported assertion that an injunction will merely delay the process with only minimal hardship to the DOE conspicuously ignores the true injured parties in such a scenario – the school children and the public, with an interest in seeing the DOE ensure reliable continuity of quality services throughout the City.  *See Parts Distribs., LLC v. City of N.Y.*, No. 03-2772, 2003 U.S. Dist. LEXIS 10548, at \*29 (S.D.N.Y. June 23, 2003) (denying preliminary injunction, concluding that although the plaintiff "face[d] a potentially devastating reduction of its business," the balance of hardships did not weigh in favor of the plaintiff contractor because the City had demonstrated that an injunction would prohibit City from pursuing bid process and "would cause serious hardship by impairing the City's ability to ensure . . . continuity of quality . . . services").  Plaintiffs make no showing that this drastic remedy is warranted here.

## CONCLUSION

For the foregoing reasons, Defendant DOE respectfully requests that the Court deny Plaintiffs' application for Entry of an Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction.


Dated: April 2, 2018                                   Respectfully submitted,


                                                       MORGAN, LEWIS & BOCKIUS LLP

                                                       By:  */s/ Melissa D. Hill*
                                                            David A. McManus
                                                            Melissa D. Hill

                                                            101 Park Avenue
                                                            New York, NY 10178-0060
                                                            Phone: (212) 309-6000
                                                            Fax: (212) 309-6001

Case 1:14-cv-07405-NRK-SMG   Document 26-1   Filed 11/08/19   Page 31 of 31 PageID
Case 1:14-cv-07405-NGG-SMG   Document 126-1   Filed 04/02/18   Page 30 of 30 PageID #: 205
#: 814

david.mcmanus@morganlewis.com
melissa.hill@morganlewis.com


*Attorneys for Defendant Attorneys for
Defendant Board of Education of the City
School District of the City of New York d/b/a
New York City Department of Education*