# EXHIBIT 2

E UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| L & M BUS CORP., B & F SKILLED, INC., HAPPY CHILD TRANSPORTATION LLC, HAPPY DAY TRANSIT INC., IRIDIUM SERVICES CORP., PENNY TRANSPORTATION INC., SELBY TRANSPORTATION CORP., SMART PICK, INC., GVC LTD, LEESEL TRANSPORTATION CORP., MAR-CAN TRANSPORTATION CO., INC., PHILIP BUS CORP., 21st AVENUE TRANSPORTATION, CO., INC., Y & M TRANSIT CORP., VAN TRANS LLC, ALINA SERVICES CORP. and MONTAUK STUDENT TRANSPORT LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK D/B/A NEW YORK CITY DEPARTMENT OF EDUCATION,<br><br>Defendant. | Civil Action No.  1:18-cv-1902 (NGG)(SMG) |

**DEFENDANT BOARD OF EDUCATION**
**OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK'S**
**SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION**

MORGAN, LEWIS & BOCKIUS LLP
David A. McManus
Melissa D. Hill

101 Park Avenue
New York, NY 10178
Tel.: (212) 309-6000
Fax: (212) 309-6001

*Attorneys for Defendant Board of Education*
*of the City School District of the City of New*
*York a/k/a New York City Department of*
*Education*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS ...........................................................................................2

    I.    The EPPs ...................................................................................................2

    II.   The DOE's Proprietary Rationale for including the EPPs in the RFB ...................5

ARGUMENT ...............................................................................................................7

    I.    INJUNCTION STANDARD..................................................................................7

    II.   PLAINTIFFS STILL CANNOT DEMONSTRATE IRREPARABLE
        HARM ..........................................................................................................7

        A.    The Risk That Plaintiffs' Potential Bids Will Be Disclosed to Other
             Bidders is Insufficient to Establish Irreparable Harm ...............................8

        B.    Plaintiffs' Allegations of Harm Remain Speculative ...............................10

    III.  PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS
        BECAUSE NEITHER ERISA NOR THE NLRA PREEMPTS THE RFB.........11

        A.    The Preemption Standard ......................................................................11

        B.    The Bid Specification Reflects the DOE's Interest in Its Efficient
             Procurement of Needed Goods and Services, Acting as a Typical
             Private Party Would in Like Circumstances.............................................13

             1.    Boston Harbor and BIECA Foreclose Plaintiffs' Claims.............13

             2.    The Market Participant Exception Is Not Limited to Project
                  Labor Agreements in the Construction Industry. ........................15

        C.    The EPPs Advance No Policy and Do Not Amount to Regulation..........18

        D.    The EPPs Are Sufficiently Narrow So as to Not Amount to Setting
             Policy or Issuing Impermissible Regulation.............................................20

CONCLUSION ..........................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Airline Serv. Providers v. Los Angeles World Airports*,
   873 F.3d 1074 (9th Cir. 2017) ........................................................................... 14, 19

*Alina Services Corp. v. Dep't of Educ.*,
   Index No. 101763/12 (N.Y. Sup Ct. N.Y. Co. July 2, 2012) ...................................... 9

*Allied Constr. Indus. v. City of Cincinnati*,
   879 F.3d 215 (6th Cir. Jan. 4, 2018) ................................................................. 13, 20

*Am. Civil Liberties Union v. Clapper*,
   785 F.3d 787 (2d Cir. 2015) .................................................................................... 7

*Associated General Contractors of America v. Metropolitan Water District of
   Southern California*,
   159 F.3d 1178 (9th Cir. 1998) ............................................................................... 18

*Bldg. & Constr. Trades Council v. Associated Builders & Contractors of
   Mass./R.I., Inc.*,
   507 U.S. 218 (1993) ....................................................................................... passim

*Bldg. & Constr. Trades Dep't v. Allbaugh*,
   295 F.3d 28 (D.C. Cir. 2002) . Though the Order ............................................... 22, 23

*Bldg. Indus. Elec. Contractors Ass'n v. City of N.Y.*,
   678 F.3d 184 (2d Cir. 2012) ........................................................................... passim

*California Grocers Ass'n v. City of Los Angeles*,
   52 Cal. 4th 177, 254 P.3d 1019 (2011) ................................................................. 14

*Cardinal Towing & Auto Repair, Inc. v. City of Bedford, TX*,
   180 F.3d 686 (5th Cir. 1999) ....................................................................... 13, 18, 19

*Chamber of Commerce v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996) ......................................................................... 20, 22

*Colfax v. Illinois State Toll Highway Authority*,
   79 F.3d 631 (7th Cir. 1996) ................................................................................... 18

*Council of N.Y. City v. Bloomberg*,
   6 N.Y.3d 380 (2006) ............................................................................................. 19

*Engine Mfrs. Ass'n v. South Coast Air Quality Management Dist.*,
   498 F.3d 1031 (9th Cir. 2007) ............................................................................... 18

*Faiveley Transp. Malmo AB v. Wabtec Corp.,*
    559 F.3d 110 (2d Cir. 2009) ......................................................................... 8

*George v. Richter,*
    No. 11-8648, 2014 U.S. Dist. LEXIS 58047 (S.D.N.Y. Apr. 25, 2014) .............. 15, 16, 17, 18

*Healthcare Ass'n of N.Y. State, Inc. v. Pataki,*
    471 F.3d 87 (2d Cir. 2006) ......................................................................... 12

*Hotel Employees & Restaurant Employees Union, Local 57 v. Sage Hospitality Resources,*
    LLC, 390 F.3d 206 (3d Cir. 2004) ................................................................ 18

*J.Z. v. N.Y.C. Dep't of Educ.,*
    281 F. Supp. 3d 352, 359 (S.D.N.Y. 2017) ....................................................... 7

*Johnson v. Rancho Santiago Cmty. Coll. Dist.,*
    623 F.3d 1011 (9th Cir. 2010) ..................................................................... 13

*Kamerling v. Massanari,*
    295 F.3d 206 (2d Cir. 2002) ......................................................................... 8

*L & M Bus Corp., et al. v. New York City Department of Education, et al.,*
    Index No. 152673 ..................................................................................... 8

*The Legal Aid Society v. City of N.Y.,*
    114 F. Supp. 2d 204 (S.D.N.Y. 2000) ................................................ 15, 16, 17, 18

*Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.,*
    965 F.2d 1224 (2d Cir. 1992) ....................................................................... 7

*Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Employment Relations Comm'n,*
    427 U.S. 132 (1976) .............................................................................. 12, 14

*Massman Construction Co. v. United States,*
    60 F. Supp. 635 (Ct. Cl. 1945) .................................................................... 10

*Merit Constr. Alliance v. City of Quincy,*
    759 F.3d 122 (1st Cir. 2014) ....................................................................... 23

*Minnesota Chapter of Associated Builders & Contractors, Inc. v. County of St. Louis,*
    825 F. Supp. 238 (D. Minn. 1993) ............................................................... 19

*Overstreet Elec. Co. v. United States,*
    47 Fed. Cl. 728 (Fed. Cl. 2000) .................................................................... 9

*Parts Distribs., LLC v. City of New York*,
    No. 03-cv-2772 (LTS), 2003 WL 21437054 (S.D.N.Y. June 2003) (Swain, J.).......................9

*Rhode Is. Hospitality Ass'n v. City of Providence*,
    667 F.3d 17 (1st Cir. 2011)............................................................................14

*RI, Inc. v. Gardner*,
    889 F. Supp. 2d 408 (E.D.N.Y. 2012) ........................................................24

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010) ..........................................................................8

*San Diego Bldg. Trades Council v. Garmon*,
    359 U.S. 236 (1959) ............................................................................11, 12

*Staten Island Bus Co. v. Board of Educ.*,
    Index No. 100798/13 (N.Y. Sup. Ct. N.Y. Co. July 25, 2013)..................9

*Sunni, LLC v. Edible Arrangements, Inc.*,
    No. 1:14-00461, 2014 WL 1226210 (S.D.N.Y. Mar. 25, 2014) ............11

*Van-Go Transport Co. v. NYC Bd. of Educ.*,
    53 F. Supp. 2d 278 (E.D.N.Y. 1999) ..............................................19, 22, 23

**Statutes**

Clean Air Act.........................................................................................18

Equal Benefits Law ...............................................................................19

Employee Retirement Income Security Act of 1974...............................*passim*

N.Y. Educ. L. § 305(14)(a).......................................................................9

N.Y. Gen. Mun. L. § 103(1) .....................................................................9

National Labor Relations Act .................................................................*passim*

## <u>PRELIMINARY STATEMENT</u>

Defendant the New York City Department of Education ("DOE") submits this supplemental memorandum pursuant to the Court's April 3, 2018 Order (Doc. Entry, dated April 3, 2018), in further opposition to Plaintiffs' application for a preliminary injunction. Like a temporary restraining order ("TRO"), a preliminary injunction is an extraordinary form of relief warranted in only the most drastic circumstances, which are not present here. The Court should deny Plaintiffs' application and allow this matter to proceed on the merits.

For all the reasons set forth in the DOE's brief in opposition to the TRO, and confirmed at the hearing on Plaintiffs' TRO application, Plaintiffs cannot establish the requisite elements for an award of injunctive relief.

At the outset, the Court was correct to recognize that Plaintiffs face no immediate or irreparable harm, and that remains true now. First, given the intervening state court injunction discussed below, Plaintiffs remain in precisely the same position as they were two weeks ago: no harm is imminent. Second, even if the state court injunction is lifted, Plaintiffs' allegations of harm remain remote and speculative, contingent on several future events that may or may not come to pass; and at most they allege potential uncertain monetary exposure, as opposed to "irreparable" harm.

Moreover, Plaintiffs are not likely to succeed on the merits of their NLRA and ERISA preemption claims. Simply put, the DOE is not acting as a regulator here, and the DOE's inclusion of Employee Protection Provisions ("EPPs") in the challenged Bid Specification, requesting competitive bids for a specific set of contracts, does not amount to regulation, let alone impermissible and preempted state regulation.

Local government regulation, in the colloquial sense, is a measure imposed by a government pursuant to its police powers that one subject to the government's reach must abide by, like it or not. In contrast, where a condition of procurement is established, interested bidders can comply and those who find the condition undesirable or unworkable simply refrain from

bidding. In the latter circumstance, the government often acts as a participant in the market in furtherance of its proprietary interests in purchasing goods and services.

The law recognizes this reality. Specifically, and as set forth below, when a government entity, like the DOE here, acts like a private party would in the efficient procurement of goods and services, such action is not preempted by federal labor laws. And when the government action – here, a contract requirement – is narrowly focused and not for purposes of advancing societal goals or policy, courts consistently find proprietary, not regulatory, conduct. Plaintiffs do not and cannot plausibly point to any purported policy that the challenged EPPs are meant to effectuate, a fact fatal to their preemption claims. The court should deny Plaintiffs' application for a preliminary injunction.

## STATEMENT OF FACTS

The DOE's brief in opposition to Plaintiffs' TRO application and the Declaration of Charlette Hamamgian provided a summary of some basic facts giving rise to the current dispute. The following additional summary is presented to aid the Court in its analysis of the arguments set forth below, and to clarify certain statements made during argument on the TRO. Further, the DOE refers the Court to the Declarations of Lisa D'Amato ("D'Amato Decl.") and Alexandra Robinson ("Robinson Decl."), submitted herewith.

### I.     The EPPs

Paragraph 4.5 of the RFB sets forth certain specifications with which successful bidders on these DOE transportation contracts will be required to comply. *See* Request for Bid, Serial B3182, Employee Protection Provisions ("EPPs"), ¶ 4.5, attached as Compl. Ex. B.

For example, Paragraph 4.5(1) establishes "Experienced School Bus Worker Lists" ("ESBW Lists"), composed of school bus workers employed by a DOE contractor or subcontractor on or after June 30, 2018, ranked according to position and seniority. *See* EPP, at § 4.5.1. At the start of the contracts, all contractors and subcontractors must "fill all positions for drivers and attendants . . . with School Bus Workers from the appropriate ESBW List" (until the

list has been exhausted). *Id.* In other words, upon the June 30, 2018 expiration of the current contracts, all then-current bus workers on such contracts, regardless of whether their former employer wins new work or not, are placed on a seniority list, ensuring continuity of employment and a relatively fixed pool of workers from which the new contracts will be staffed.

Plaintiffs' claim that this provision means the bus companies must "fire all their current employees"[1] is inaccurate and misleading. The requirement that all current workers on the expiring contracts – workers whose employers' contracts are ending June 30, 2018 – be placed on the ESBW Lists for staffing the new contracts applies only at the inception of the newly awarded contracts. Thus, the provision virtually ensures that *all* such workers *will* have jobs as of September 2018. *See* EPP ¶ 4.5.1.[2]

Further, as Paragraph 4.5.1 makes clear, for each year of the five-year contract *after its inception*, a contractor or subcontractor who is mid-contract "*may retain and/or rehire School Bus Workers who were employed by and performed services for such Contractor or subcontractor in connection with a B3182 Contract as of June 30 of the immediately prior school year.*" *Id.* (emphasis added).

As for Plaintiffs' assertions that they are at the mercy of a workforce they do not want, nothing in Paragraph 4.5.1 or elsewhere in the RFB precludes a contractor from disciplining or terminating an employee as appropriate, at its discretion. *See* Second Amended Questions & Answers-Round 1 ("2nd Am. Round 1 Q&A"), Compl. Ex. C, at #6, 106. Further, the stringent

---

[1] Compl. ¶¶ 61-62; Plaintiffs' Memorandum of Law in Support of Their Application for Entry of an Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction ("Pl. Opening Mem."), dated March 28, 2018, at p. 8; Transcript of Hearing held on April 3, 2018 ("TRO Hearing Tr.") at 6:5-6, 14:8-10, 37:23-25.

[2] Plaintiffs' alleged concerns about "firing" all the workers implicitly assumes that incumbent contractors whose contracts are expiring on June 30 will definitely be awarded work. Plaintiffs also ignore that the provision ensures fair and open competition such that *all* potential bidders (incumbents and newcomers) are treated equally, and there is no disadvantage to new bidders (or advantage to incumbent contractors) regarding the selection or composition of their initial labor forces on the new contracts.

requirements for DOE certification of school bus workers ensure a competent, appropriate workforce. D'Amato Decl. ¶ 19. It must be remembered that for decades, the DOE's school-age bus contracts have used master seniority lists and Plaintiffs offer no evidence that the system has led to staffing problems. *Id*. ¶ 12.

In addition, Paragraph 4.5 operates to incentivize workers (whether or not their former employers are awarded new contracts) by ensuring that employees on the ESBW Lists are guaranteed hiring seniority as well as certain benefit levels, minimum wage levels and, where applicable, the ability to continue in their former pension fund unless they elect otherwise. *See* EPP ¶ 4.5.2-4. Specifically, the provision ensures that an ESBW List worker's new employer will honor a higher wage scale of the worker's prior employer, and make certain minimum contributions towards that worker's health and welfare benefits at a level the DOE determined was akin to a prevailing rate in the industry. *Id.* at 4.5.3; *see also* 2nd Am. Round 1 Q&A at #33.

Notably, Paragraph 4.5 does *not* require contractors to enter into a collective bargaining agreement ("CBA") or to establish any health or welfare plan or any pension plan. *See* EPP, ¶ 4.5.3-4; 2nd Am. Round 1 Q&A, at #33. Rather, it simply requires contractors to compensate workers on an ESBW List in a manner commensurate with what they have come to expect from their prior employers, and to make monetary contributions to such worker's prior, already existing, pension plan, where applicable. *See* EPP, ¶ 4.5.2-4; 2nd Am. Round 1 Q&A, at #33-37. Similarly, Paragraph 4.5.4 does not require any contractor to make contributions to more than one pension fund on behalf of the same employee, 2nd Am. Round 1 Q&A, at #33-37, 119, contrary to Plaintiffs' contention*, see* Pl. Opp. Mem. at p. 28; TRO Hearing Tr. at 10-11. To the extent any of Plaintiffs are parties to existing CBAs that require them to make certain benefit contributions or to contribute to certain pension or other retirement plans, they are free to negotiate any necessary changes in order to comply with this or any other provision of the RFB and avoid any potential obligation to contribute to two plans for one employee. 2nd Am. Round

1 Q&A, at #33-37, 119.  And, according to Plaintiffs, only ten of the 17 Plaintiff companies are affiliated with any union and party to a related CBA.[3]

## II.    The DOE's Proprietary Rationale for including the EPPs in the RFB

Prior to issuing the original Bid Specification in December 2017, the DOE performed a thorough pre-decisional analysis of the pertinent facts and circumstances.  *See* Memo from E. Lester to E. Rose et al. re: New EPP Provisions in Procurements of New K-12 Bus Contracts, Dec. 26, 2017 ("EPP Memo") (Doc. 13-2).  As the EPP Memo sets forth, the DOE, in its provision of transportation services to New York City schoolchildren, faces a significant threat of labor unrest if EPPs are not included in the RFB for new contracts.  The DOE's evaluation of the history of the EPPs in school-age bus contracts, including the immediate labor unrest that ensued when requests for bids were issued without EPPs, as well as current ongoing threats of striking workers and work stoppage, was central to its decision to include these provisions in the present RFB.  EPP Memo at 3-9.  *See also* EPP Memo at Ex. 2, Report of M. Gottfried, The Perils of Absenteeism and the Role of the School Bus (describing the negative impact on schoolchildren in the event a school bus strike restricts access to school busing and results in absenteeism).  The DOE's school bus contracts exist so that children can get to school and be educated; if the services are disrupted, the very purpose of these contracts is undermined.  The DOE's proprietary interests here are not only present but extremely compelling.

Likewise, the DOE concluded that bidding out school-age bus contracts with EPPs would facilitate a solution to a severe pension withdrawal liability problem faced by many bus companies.  *Id.* at 16.  Specifically, based in part on the operation of the prior EPPs, in 1983 the Pension Benefit Guaranty Corporation ("PBGC") had issued the Division 1181 Pension Fund ("1181 Fund") (then the overwhelmingly majority union among New York City school bus drivers and attendants) an exemption from withdrawal liability when contractors cease

---

[3]  As further evidence of the limited impact of Plaintiffs' argument, there are 34 companies that currently have DOE school-age bus contracts which have not joined in as plaintiffs/petitioners in this or the state court proceeding challenging the RFB at issue here.  D'Amato Decl. ¶ 17.

contributing to the 1181 Fund.  *Id.* at 9-10.  That exemption remained in place until 2013, when the 1181 Fund amended its rules to waive that exemption, triggering potential withdrawal liability (and related litigation) for over a dozen contractors.  *Id.* at 10.  The DOE concluded in its analysis that as a result of including the EPPs in the new contracts, the 1181 Fund would reinstate the prior PBGC exemption and potentially set the stage for other pension funds to obtain similar exemptions, thus alleviating the threat of withdrawal liability for potential bidders, and fostering open competition.  *Id.* at 18.  Alleviating pension withdrawal liability is essential to the DOE's proprietary interest in having a healthy, competitive market of vendors who can provider services under these contracts.

Further, the DOE concluded that including EPPs in the RFB would facilitate a solution to a current shortage of drivers in the DOE's school district.  EPP Memo at p. 15.  The DOE's demand for certified, qualified bus drivers increased significantly over the past five years and contractors are having difficulty finding and retaining skilled drivers.  *Id.*  The retention of skilled workers is critically important where the workers are dealing with vulnerable populations such as the special-needs students served by the DOE contracts at issue here.  In addition to quality, consistency of drivers and attendants during each school year is important for children with special needs.  *Id.*  Through the inclusion of the EPPs, the DOE hoped to address the recent difficulties in attracting and maintaining the necessary workforce level by maintaining wages and benefits for these workers.  The DOE's contracts need to be adequately staffed for its proprietary interests to be effectuated.  *Id.* at 15-16.

In sum the DOE concluded that:

[b]idding out all of the school-age bus contracts and introducing new contracts with New EPPs is the most desirable course of action under the circumstances, and the only realistic way for DOE to reap the benefits of competition, avoid strikes, and be in a position for its contractors' Pension Funds to eventually seek a broad exemption from pension withdrawal liability and facilitate the availability and retention of a stable, skilled workforce.

*Id.* at 17.

The DOE evaluated the potential increase to contractor costs in terms of increased wages and benefits, and concluded that any such costs are "outweighed by the benefits expected to be achieved through competition and the negative impacts avoided through labor peace." *Id.* at 18. "In sum, the current situation, in which DOE is unable to compete at all due to the threat of labor unrest, and with no way forward to address oppressive potential withdrawal liability for contractors, cannot be cost-effective." *Id.*

## ARGUMENT

## I.   INJUNCTION STANDARD

Plaintiffs' application for a preliminary injunction is assessed under the same standard Plaintiffs failed to meet on their TRO application. *Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992) ("[the] standards which govern consideration of an application for a temporary restraining order . . . are the same standards as those which govern a preliminary injunction."); *see also* Memorandum & Order, dated April 5, 2018 ("TRO Decision") at p. 5 ("'The standards for granting a temporary restraining order and preliminary injunction are the same.'") (quoting *J.Z. v. N.Y.C. Dep't of Educ.*, 281 F. Supp. 3d 352, 359 (S.D.N.Y. 2017)). In order to establish an entitlement to preliminary injunctive relief, Plaintiffs must prove that: (a) they are likely to suffer irreparable harm in the absence of preliminary relief; (b) they are likely to succeed on the merits of their claims; (c) the balance of equities tips in their favor; *and* that (d) an injunction is in the public interest. *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 825 (2d Cir. 2015). As on their application for a TRO, Plaintiffs fail to make the necessary "clear showing" that they are entitled to a preliminary injunction.

## II.   PLAINTIFFS STILL CANNOT DEMONSTRATE IRREPARABLE HARM

First, Plaintiffs cannot demonstrate that they are likely to suffer "irreparable harm" if the Court does not award a preliminary injunction. "A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Transp.*

*Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal citation omitted).  To that end, Plaintiffs must show that the irreparable injury is likely before the other requirements for an injunction will be considered.  *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002).  Courts must not presume irreparable harm; "[r]ather, plaintiffs must show that, on the facts of their case, the failure to issue an injunction would actually cause irreparable harm."  *Salinger v. Colting*, 607 F.3d 68, 82 (2d Cir. 2010).  Plaintiffs' application for a preliminary injunction relies on the same alleged (and facially deficient) harms that this Court found insufficient to justify a TRO, and such allegations remain deficient and thus insufficient to justify the extraordinary remedy of a preliminary injunction.

### A.  The Risk That Plaintiffs' Potential Bids Will Be Disclosed to Other Bidders is Insufficient to Establish Irreparable Harm

In denying the TRO, the Court rejected Plaintiffs' counsel's argument, raised for the first time at the TRO Hearing, regarding the public opening of the bids as not "sufficiently serious such that injunctive relief is necessary."  *Id*. at 9.  That has not changed.  Specifically, this Court heard argument on Plaintiffs' application for a TRO on April 3, 2018 ("TRO Hearing") and issued the TRO decision on April 5, 2018.  That same day, April 5, 2018, a New York State Supreme Court issued a temporary restraining order in the matter *L & M Bus Corp., et al. v. New York City Department of Education, et al.*, Index No. 152673 ("State Court Action"), enjoining the closing of the bidding process for the same contracts at issue in this litigation ("State Court TRO").  *See* Decision and Order in State Court Action, dated April 5, 2018 (Doc. 17-1).[4]  The DOE is appealing that ruling, and the New York Supreme Court is also scheduled to hear argument on the question of whether a preliminary injunction should issue on April 24, 2018.  If, under either of those circumstances, the State Court TRO is vacated and the bidding process is allowed to proceed, Plaintiffs still will incur no irreparable harm simply from the mere opening of bids, as this Court already held.  Indeed, courts have refused to find irreparable harm warranting injunctive relief through the public disclosure of a bid, defeating any argument from

---

[4] That decision was based upon state law arguments that are not before this Court.

Plaintiffs that once the bids are opened, the Court cannot "unring the bell." *See, e.g.*, *Parts Distribs., LLC v. City of New York*, No. 03-cv-2772 (LTS), 2003 WL 21437054 (S.D.N.Y. June 2003) (Swain, J.) (finding that the public opening of bids did not constitute irreparable harm).[5] Notably, in *Parts Distributors*, which this Court cited to in the TRO Decision, Judge Swain found that the public opening of bids for a City contract was not irreparable harm for the purposes of granting a preliminary injunction *even though* the Court previously granted the plaintiffs' application for a TRO and extended the TRO an additional 10 days. *Id*. at *7.

Further, as the Court recognized in the TRO Decision, there is no competitive harm to Plaintiffs if bids are publicly opened because, if the bid process goes forward, "all companies who bid on the Contract will have their bids disclosed." *See* TRO Decision at p. 9. Indeed, the DOE would be permitted under New York State Law to restart any bidding process after bids have been opened.[6] Bidders' learning of each others' bid prices is simply not irreparable harm under New York law.[7] Therefore, as the Court has already determined, Plaintiffs are unable to establish irreparable harm based on the public opening of their hypothetical bids.

---

[5] *See also Staten Island Bus Co. v. Board of Educ.*, Index No. 100798/13 (N.Y. Sup. Ct. N.Y. Co. July 25, 2013) (denying application for a TRO to enjoin bid on school-age bus contracts because "[w]hile the deadline is now imminent, the court finds that petitioner has not shown it will be irreparably harmed if the submission goes forward"); *Alina Services Corp. v. Dep't of Educ.*, Index No. 101763/12 (N.Y. Sup Ct. N.Y. Co. July 2, 2012) (denying application to enjoin bid solicitation process). Copies of the decisions in *Staten Island Bus Co.* and *Alina Services* are annexed hereto as Appendices A and B, respectively.

[6] *See* N.Y. Educ. L. § 305(14)(a) (authorizing education commissioner to "reject any or all bids if, in his opinion, the best interests of the district will be promoted thereby and, upon such rejection of all bids, the commissioner shall order the board of education or trustee of the district to seek, obtain and consider new proposals"); N.Y. Gen. Mun. L. § 103(1) (authorizing government bidder "in his or her or its discretion, [to] reject all bids or offers and readvertise for new bids or offers . . .").

[7] To the extent Plaintiffs point to federal cases governed by the Federal Acquisition Rules (FAR), those cases do not support their position here. For example, in, *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728 (Fed. Cl. 2000), the bids had already been opened and the issue was whether a contract award should be enjoined. We are nowhere near the contract award stage here. Moreover, the rationale of the court was in any event based on the very different standard in the FAR which requires a "compelling reason" to reject all bids. *Id.* at 732. In contrast, under New York law, all bids can be rejected in the discretion of the governmental body. Nor is

### B.      Plaintiffs' Allegations of Harm Remain Speculative

In its TRO Decision, the Court suggested that, while it did not believe Plaintiffs had alleged irreparable harm currently entitling them to any injunctive relief, Plaintiffs' allegations of harm may "become sufficient . . . at a future point in time – be it after the bids are opened, after the contracts are awarded, after the awards have been approved by the Panel for Education Policy, or at some other juncture." *Id.* at p. 10. As of the date of this submission, none of those events have come to pass, and they all remain remote and speculative.

First, exposure to legal liability remains remote and speculative and does not entitle Plaintiffs to a preliminary injunction. The Court correctly found this alleged exposure too vague and remote to satisfy the irreparable harm prong for purposes of awarding a TRO. TRO Decision at p. 7. Such alleged threat of "legal liability" is no less remote now than it was when the Court issued the TRO Decision. Whether any of the 17 Plaintiffs will become a successful bidder and subject to this alleged, amorphous, liability, is far from certain.

Plaintiffs still cannot explain how any alleged "future legal liability" will arise if any one of the 17 companies is awarded a contract. TRO Decision at p. 7. Plaintiffs' suggestion that a contract could cause a change in the Plaintiffs' workforce composition that may trigger Plaintiffs' obligations under unspecified Worker Adjustment and Retraining Notification ("WARN") laws, which generally require employers to give notice to employees prior to certain reduction in force events (e.g., widespread layoffs, plant closings, etc.), *see* TRO Hearing Tr. at p. 17:24 -18:2, says nothing of any irreparable harm to Plaintiffs. To the contrary, Plaintiffs' counsel seemed to suggest that WARN obligations would arise regardless of whether Plaintiffs are awarded contracts. *Id.* at 17:24-25 ("[I]f we win, or even if we lose the RFB, we're going to have to give notice to the employees . . ."). Plaintiffs' contention in that regard seems to be with

---

*Massman Construction Co. v. United States*, 60 F. Supp. 635 (Ct. Cl. 1945), on point. The case had nothing to do with enjoining a bid opening; the issue was whether a bidder could obtain reformation based on an alleged mistake.

the mere fact that their expiring contracts are being put out to bid, untethered to the actual terms in the RFB (or any effect of those terms).

Next, the speculative "loss of goodwill" does not entitle Plaintiffs to a preliminary injunction. The Court correctly held that such allegations were too remote to necessitate the issuance of a TRO, and that remains true. TRO Decision at p. 8. Plaintiffs cannot show any change in circumstances arising since the TRO Decision that would justify a different conclusion with respect to their application for a preliminary injunction.

Additionally, Plaintiffs have not explained how merely allowing the bidding process to continue will adversely affect their relationships with their employees, or what would be irreparable about any alleged resulting harm. This precludes any finding that the harms are imminent and irreparable. *See Sunni, LLC v. Edible Arrangements, Inc.*, No. 1:14-00461, 2014 WL 1226210, at *11 (S.D.N.Y. Mar. 25, 2014). Accordingly, Plaintiffs have not established any alleged "loss of goodwill" to constitute irreparable harm here.

Finally, the Court's prior findings regarding the insufficiency of Plaintiffs' claims of harm apply with equal force to Plaintiffs' instant application for a preliminary injunction. *See* TRO Decision at p. 5 (standard for granting TRO is same as for granting preliminary injunction). Plaintiffs have failed to meet this standard for all of the reasons set forth in the Court's TRO Decision. *See* TRO Decision at p. 6-7, 9. The Court should reach the same conclusion with respect to Plaintiffs' application for a preliminary injunction.

Accordingly, Plaintiffs have not established the irreparable harm prong of the injunctive relief standard and their application for a preliminary injunction must be denied.

## III.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS BECAUSE NEITHER ERISA NOR THE NLRA PREEMPTS THE RFB

### A.    The Preemption Standard

The NLRA contains no express preemption provision. Rather, the Supreme Court has articulated two distinct NLRA preemption principles, neither of which is satisfied here. The first, known as *Garmon* preemption, forbids state and local regulation of activities that are

protected by or constitute an unfair labor practice under the NLRA.  *See Bldg. & Constr. Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 225 (1993) ("*Boston Harbor*") (citing *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959)).

The second, *Machinists* preemption, prohibits state and municipal regulation of areas that have been left "'to be controlled by the free play of economic forces.'"  *Boston Harbor*, 507 U.S. at 225-26 (citing *Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Employment Relations Comm'n*, 427 U.S. 132, 147 (1976)).  As the Supreme Court explained, "*Machinists* preemption preserves Congress' intentional balance between the uncontrolled power of management and labor to further their respective interests."  *Boston Harbor*, 507 U.S. at 226.  In effect, NLRA preemption "prevents a State from regulating within a protected zone, whether it be a zone protected and reserved for market freedom, see *Machinists*, or for NLRB jurisdiction, see *Garmon*."  *Id.* at 226-27.  But "[a] State does not regulate, however, simply by acting within one of these protected areas.  When a State owns and manages property, for example, it must interact with private participants in the marketplace.  In so doing, the State is not subject to preemption by the NLRA, because preemption doctrines apply only to state *regulation*."  *Id.* at 227.  The Second Circuit expressly recognized that "[s]uch marketplace interactions are not regulation and so are not normally subject to preemption analysis."  *Bldg. Indus. Elec. Contractors Ass'n v. City of N.Y.*, 678 F.3d 184, 188 (2d Cir. 2012) ("*BIECA*") (citing *Healthcare Ass'n of N.Y. State, Inc. v. Pataki*, 471 F.3d 87, 108 (2d Cir. 2006)).

The *Boston Harbor* preemption inquiry can be framed in two inquiries:

- First, does the challenged action essentially reflect the entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances?

- Second, does the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem?

*Cardinal Towing & Auto Repair, Inc. v. City of Bedford, TX*, 180 F.3d 686, 693 (5th Cir. 1999).[8]

Here, the RFB is not a state regulation and the DOE is not acting as a regulator.

**B.      The Bid Specification Reflects the DOE's Interest in Its Efficient Procurement of Needed Goods and Services, Acting as a Typical Private Party Would in Like Circumstances.**

1.      ***Boston Harbor* and *BIECA* Foreclose Plaintiffs' Claims.**

The Supreme Court's decision in *Boston Harbor* and the Second Circuit's ruling in *BIECA* plainly foreclose Plaintiffs' claim here.  Analogous to the facts at hand, the Supreme Court reviewed a specification in a bid solicitation for contracts for a massive cleanup project for Boston Harbor.  *Boston Harbor*, 507 U.S. at 218.  Similarly, in *BIECA,* the Second Circuit addressed a challenge to labor conditions imposed on contracted construction projects throughout New York City.  *BIECA*, 678 F.3d at 184-86.  Plaintiffs in both cases, like Plaintiffs here, challenged the bid specifications and labor conditions therein as violative of and preempted by the NLRA.  And in both cases, the court found that the governmental defendants acted as market participants, in furtherance of their respective proprietary interests, and not as regulators, when establishing certain minimum labor requirements for their contractors on their respective projects.  *Boston Harbor*, 507 U.S. at 233; *BIECA*, 678 F.3d at 192.  The same result, on the same analysis, is warranted here.

The market participant analysis, in effect, looks to whether the "behavior" of the government entity seeking goods or services compares to a private sector contractor "in similar circumstances."  *Boston Harbor*, 507 U.S. at 229; *BIECA*, 678 F.3d at 187-188, 192 ("Acting like a proprietor does not mean acting exclusively with the narrow goal of minimizing costs

---

[8]  Both the Sixth and the Ninth Circuits have followed the *Cardinal Towing* test to analyze whether the market participant exception is met.  If the challenged action meets the elements of the first step, these two circuit courts will infer that the government's conduct was proprietary without considering the second step.  If the government entity does not meet the requirements of the first step, then these courts will next analyze the government's action under *Cardinal Towing*'s second step.  *See Allied Constr. Indus. v. City of Cincinnati*, 879 F.3d 215, 221 (6th Cir. Jan. 4, 2018); *Johnson v. Rancho Santiago Cmty. Coll. Dist.,* 623 F.3d 1011 (9th Cir. 2010).  Here, the RFB meets both elements of the test.

regardless of consequences.").  Here, although the scale of the DOE's school bus contracts is large, a court can still apply this analysis by looking at how a private sector contractor might address similar needs, as the Supreme Court did in the context of the Boston Harbor clean-up.[9]  Here, the DOE did what any rational private sector purchaser of services would do when considering obstacles to the efficient delivery of needed services – it analyzed the problems, explored available options, and designed contract provisions for its Bid Specification to secure services in a way that would facilitate labor peace, minimize the threat of withdrawal liability assessments that might deter prospective bidders, and attract and preserve a qualified and stable workforce.  *See supra* at 5-7; EPP Memo at p. 10-11, 14-16.

Thus, like the Massachusetts government entity in *Boston Harbor*, the DOE here, in the role of a purchaser of school bus transportation services, is acting precisely as a private contractor would act, conditioning its purchasing upon certain labor-related requirements.  507 U.S. at 231-33; *see also BIECA*, 678 F.3d at 192 (challenged contract provisions "represent the City's proprietary choice; the City has behaved just as any other major landowner or developer might to secure labor for many of its construction projects," finding "market activity and not regulation").[10]

---

[9] *See Airline Serv. Providers v. Los Angeles World Airports*, 873 F.3d 1074, 1080-81 (9th Cir. 2017) (evaluating how a private sector entity would address the same concerns the City of Los Angeles confronted when managing LAX airport, noting that a private sector contractor would have a pressing interest in preserving labor peace, and "[t]hose interests are not any less pressing simply because the City rather than a private business operates the airport, and labor peace agreements are one way to protect those interests").

[10] Plaintiffs' complaint that the EPPs deprive employers of the right to decide who to hire does not support preemption.  TRO Hearing Tr. at 6:16-9:14; Pl. Opening Mem. at p. 12-14.  The right to choose one's employees is not a right Congress intended to leave for the free play of market forces, and thus does not come within the reach of *Machinists* preemption.  *See Rhode Is. Hospitality Ass'n v. City of Providence*, 667 F.3d 17, 34 (1st Cir. 2011) (rejecting argument that under Machinists, NLRA preempts state regulation mandating in limited circumstances the hiring of a previous employer's employees by a new employer); *California Grocers Ass'n v. City of Los Angeles*, 52 Cal. 4th 177, 202, 254 P.3d 1019, 1034 (2011) (rejecting argument that "the NLRA was founded on and assumes an employer's unfettered right to select its employees" and finding NLRA does not preempt state ordinance generally requiring grocery stores to retain

2.      **The Market Participant Exception Is Not Limited to Project Labor Agreements in the Construction Industry.**

Unable to escape the holdings of *Boston Harbor* and *BIECA*, Plaintiffs, at oral argument, claimed that the market participant exception and the associated legal authority is limited to Project Labor Agreements ("PLAs") in the construction industry for which, Plaintiffs claim, the NLRA allows an exception.  TRO Hearing Tr. at 15, 35-36.[11]  Plaintiffs are wrong.  To the contrary, analysis of *Boston Harbor* confirms that such exception was simply an *additional* reason for upholding the challenged bid specification contained within a PLA there, not a necessary one.  507 U.S. at 230 (noting that "[p]ermitting states to participate freely in the marketplace is not only consistent with NLRA preemption principles generally" but also consistent with the construction industry exception, not that the latter was necessary to the analysis).  Plaintiffs cite no case holding that an express Congressional exception is a necessary predicate to finding proprietary conduct.

Moreover, district courts in the Second Circuit have applied the market participant exception – and the express reasoning of *Boston Harbor* and *BIECA* – outside the context of construction PLAs.  *See The Legal Aid Society v. City of N.Y.*, 114 F. Supp. 2d 204 (S.D.N.Y. 2000); *George v. Richter*, No. 11-8648, 2014 U.S. Dist. LEXIS 58047 (S.D.N.Y. Apr. 25, 2014).

---

former staff for 90 days after a change in ownership).  Indeed, even as to plainly regulatory and not proprietary conduct such as we have here, courts have rejected arguments in favor of a right to choose employees and upheld related government action.  *Id.* In any event, because the conduct here is proprietary, rather than regulatory, preemption does not apply.

[11] It bears noting that PLAs, like the kind upheld in *Boston Harbor* and *BIECA*, typically impose on winning bidders detailed and onerous conditions that must be adhered to through the life of the contract, such as recognition of one party as "the exclusive bargaining agent for all [] employees; use of specified methods for resolving all labor-related disputes; a requirement that all employees be subject to union security provisions . . . ; [use of] hiring halls to supply the project's craft labor force; a 10-year no-strike commitment; and a requirement that all contractors and subcontractors agree to be bound by the agreement."  *Boston Harbor*, 507 U.S. at 221-22; *see also BIECA*, 678 F.3d at 186 (noting City PLAs at issue "contain terms typical of PLAs" such as requiring payment of dues, regardless of whether employees join a particular union, labor hired through hiring halls, contractor contributions to affiliated union fringe benefit funds, standard work rules and hours, no-strike clauses, and dispute resolution systems).

In *Legal Aid*, the Legal Aid Society and unions representing Legal Aid attorneys brought suit against the City, claiming the City had, among other things, violated their federal rights by interfering with an ongoing labor dispute.  The Legal Aid attorneys had gone out on strike and, in response, the City issued two RFPs covering the provision of legal services that specifically prohibited the Legal Aid Society from responding or submitting a bid.  *Legal Aid*, 114 F. Supp. 2d at 211-12.  The City maintained that these actions, which "redistributed business from Legal Aid" to other entities, "served the legitimate proprietary purpose of decreasing the City's exclusive reliance on Legal Aid as a safeguard against possible disruptions from future labor disputes between Legal Aid, its employees, and the Unions."  *Id.* at 236.  The district court found that the City was acting as a market participant – not a regulator – when soliciting such bids:

> In the present case, the City has not attempted to regulate all attorneys practicing within the legal services market, and has not attempted to exclude Legal Aid from the market altogether, but has only attempted to restructure its relationship with Legal Aid in an effort to minimize possible disruptions in the provision of legal services.

*Id.* at 239.  As such, the district court dismissed Legal Aid's action against the City, holding that the City's conduct was not preempted under the market participant exemption.  *Id*. at 240.

Similarly, in *George v. Richter*, a union representing employees of not-for-profit social services organizations (including Head Start programs and certain day care centers) sued the City, claiming the City had interfered with the union's collective bargaining rights by insisting that the unions receive health and other benefits through a New York State plan rather than the union's own welfare funds in a procurement for funding for Head Start and other not-for-profit day care centers.  2014 U.S. Dist. LEXIS 58047, at *1-6.  According to the union, the City sought to accomplish this goal by issuing an RFP that provided insufficient funding for the then-current cost of health benefits available through the union's funds.  *Id*. at *8.

The district court, after surveying the law, found that the City had acted "well within the 'market participant' exception," especially where the "challenged action essentially reflect[s] the [City's] own interest in its efficient procurement of needed goods and services" through the RFP.

*Id.* at \*33 (internal quotations omitted).  Specifically, the district court found that the City was merely implementing changes as part of its effort to obtain cost savings in the programs it funded, and was not attempting to regulate all child care services in the City or attempting to exclude unionized day care centers from participating in the new program outlined in the RFP. *Id.* at 35.  Instead, the court found that the "City [was] simply restructuring its relationship with day care providers as part of a broader effort to achieve costs savings."  *Id*.  As the district court explained:

> "Congress did not intend states' [or city's] decisions about how to spend their own money as participants in the labor market to be subject to the same scrutiny as state [or city] regulation of the private labor market."  *See* [*BIECA*], 678 F.3d at 187-88.  The fact that the City's "proprietary actions in this case may have incidental effects on labor in the [child care] market does not, by itself, alter this outcome."  *Legal Aid Society*, 114 F. Supp. 2d at 239.  "The Supreme Court has 'held consistently that the NLRA was intended to supplant state labor regulation, not all legitimate state activity that affects labor.'"  *Id.* (quoting *Boston Harbor*, 507 U.S. at 227).  Here, the City's actions—whether in issuing the RFP or allegedly influencing the collective bargaining process by not agreeing to the unions' proposal for the delivery of health benefits—may affect labor, but the City has deemed these measures necessary to achieve necessary cost savings. The law permits municipalities to take such steps as market participants.

*Id.* at \*36.

The permissible, proprietary goals of the City's procurement in *Legal Aid* and *George* are echoed in the DOE's conduct here.  For example, through the challenged RFB, the DOE hopes to put out for bid and restructure certain of its contracts for school bus transportation services, including its relationship with its contractors and their employees through inclusion of the EPP. EPP Memo at 2-3.  The current RFB has absolutely no impact on any of the multitudes of other vendor and service provider contracts DOE puts out for bid or enters into in multiple other areas of its broad educational mission throughout New York City.  D'Amato Decl. at ¶ 18.  Finally, the RFB seeks to increase efficiency and save costs through, among other things, competitive bidding and supporting the efforts of bus companies that may seek a potential exemption from

pension plan withdrawal liability.  EPP Memo at p. 11, 15.  These actions, like the steps taken by the City in *Legal Aid* and *George*, establish that the DOE is acting as a market participant.[12]

###   C.    The EPPs Advance No Policy and Do Not Amount to Regulation.

The challenged RFB also does not seek to further any societal policy or goal, rendering the DOE a market participant and not a regulator here.  "The law has traditionally recognized a distinction between regulation and actions a state takes in a proprietary capacity – that is to say, actions taken to serve the government's own needs rather than society as a whole . . . [and] this distinction is most readily apparent when the government purchases *goods and services* its operations require on the open market."  *See Cardinal Towing*, 180 F.3d at 691.  "[C]ourts have found preemption when government entities seek to advance general societal goals rather than narrow, proprietary interests through the use of their contracting power."  *Id.* at 692.  However, preemption does not apply when governments issue contract specifications that apply to discrete contracts and were designed to insure efficient performance rather than advance abstract policy goals.[13]  Indeed, as the Fifth Circuit observed, "[m]ost government contracting decisions do not

---

[12] Allegations of "political cronyism" and the like fall short of establishing regulation as opposed to proprietary conduct.  *See BIECA*, 678 F.3d at 188, 190-91 (rejecting argument that procurement was intended to further interest of union politically aligned with city officials and so could not fall within market participant exception, and finding instead that objective purpose, not political motivations, is relevant, and that a government's actions need not be cost-saving in order to be proprietary).  Moreover, even if the terms of a procurement are not maximally efficient, the government conduct is still not transformed into regulation.  *Id.* at 191-92.  To the extent Plaintiffs' challenge is rooted in their disagreement with the wisdom of the DOE's decision to include the EPPs, the market participant analysis does not require that the court or anyone else agree that the market participant chose the best means of effectuating its interests. *Id.*

[13] *See Associated General Contractors of America v. Metropolitan Water District of Southern California*, 159 F.3d 1178, 1183 (9th Cir. 1998) (requirement that contractors on project adhere to a particular collective bargaining agreement that included benefit package was not preempted by ERISA); *Colfax v. Illinois State Toll Highway Authority*, 79 F.3d 631, 634-35 (7th Cir. 1996) (requirement that contractor adhere to area collective bargaining agreement was not preempted by NLRA); *Engine Mfrs. Ass'n v. South Coast Air Quality Management Dist.*, 498 F.3d 1031, 1050 (9th Cir. 2007) (Clean Air Act does not preempt state regulations directing state and local government entities' purchasing, procurement, leasing and contracting decisions because such entities are acting as market participants in transactions); *Hotel Employees & Restaurant Employees Union, Local 57 v. Sage Hospitality Resources*, LLC, 390 F.3d 206, 215-216 (3d Cir.

constitute concealed attempts to regulate, however. In order to function, government entities must have some dealings with the market." *Id.* "*Boston Harbor* recognized this reality," *id.*, and so, too, should this Court.

Plaintiffs here cannot identify any policy purportedly being advanced by the DOE through the challenged bid specification because none exists. Plaintiffs' papers wholly fail to identify such a policy, and, when asked at the TRO Hearing, Plaintiffs could not identify any policy but merely claimed that the DOE's goal is "[t]o help Local 1181" and "to prop up their pension fund." TRO Hearing Tr. at 42-43. This alleged goal is not only incorrect but is also not the type of societal goal that would establish that the DOE was acting as a regulator. Here, there is plainly an objective purpose of serving valid procurement ends. *See supra* at 5-7. *BIECA*, 678 F.3d at 191 ("We will not search for an impermissible motive when a permissible purpose is apparent."); *see also Cardinal Towing*, at 180 F.3d at 693-94.[14]

To the contrary, as the facts make clear, the RFB specifications serve the clear proprietary interests of the DOE. Specifically, the DOE here has identified three primary – proprietary – reasons for the terms of the Bid Specification, any one of which standing alone would be sufficient to demonstrate that the DOE is acting as a market participant:

- The DOE as a market participant has the right to secure labor peace and avoid business disruption through its procurement process. *See*, *e.g.*, *Airline Serv.*

---

2004) (city acted as market participant when enacting ordinance requiring contractors who worked on certain city-funded developments be signatory to a collective bargaining agreement); *Minnesota Chapter of Associated Builders & Contractors, Inc. v. County of St. Louis*, 825 F. Supp. 238, 243-44 (D. Minn. 1993) (county's requirement that bidders for jail construction contract agree to labor agreement that set benefit levels but also contained nonstrike clause not preempted by ERISA).

[14] *Cf. Van-Go Transport Co. v. NYC Bd. of Educ.*, 53 F. Supp. 2d 278, 288-89 (E.D.N.Y. 1999) (rejecting government's post-hoc attempt to disguise regulatory policy, and finding decision not to certify any conditional strike replacement workers had the purpose and effect of government throwing weight behind one of the parties to a labor-management dispute, amounting to regulatory policy); *Council of N.Y. City v. Bloomberg*, 6 N.Y.3d 380, 395 (2006) (rejecting market participant finding where government "was obviously 'setting policy'" through enacting Equal Benefits Law, which was "designed to induce contractors to treat domestic partners and spouses equally"). *See also* DOE's Opposition (Doc. 12) at p. 21-23.

Case 1:14-cv-01625-NGG-SMG   Document 63-2   Filed 11/18/13   Page 25 of 29 PageID #: 868

*Providers Ass'n v. Los Angeles World Airports*, 873 F.3d 1074 (9th Cir. 2017) ("If a private entity operated LAX [airport], that entity would have a pressing interest in avoiding strikes, picket lines, boycotts, and work stoppages . . . [these] interests are no less pressing because the City . . . operates the airport."); *see also* EPP Memo, Doc. 13-2, at 14-15 (concluding that new EPP will decrease "real" threat of labor disorder);

- The DOE has a right to manage potential legal exposure, including to help the bidding contractors manage their own potential exposure, to withdrawal liability. *See, e.g.*, *Allied Contr. Indus.*, 879 F.3d at 221-22 ("Just as a private purchaser can seek certain concessions from a contractor, so too can a state or municipality."); *see also* EPP Memo, at 15 (new EPPs "should ultimately allow Pension Funds to seek a broad-based PBGC exemption, removing threats of contractors incurring pension withdrawal liability");

- The City has a "strong proprietary interest in developing a skilled workforce" to provide the needed services. *Allied Contr. Indus.*, 879 F.3d at 22; *see also* EPP Memo, at p. 15-16 (concluding that new "EPPs should . . . facilitate the retention of experienced bus workers in the DOE's school district").

The DOE's stated reasons for the EPPs defeat any inference Plaintiffs wish to draw that the DOE's goal was instead to effect policy or regulate. Like the Massachusetts government entity in the *Boston Harbor* case, the DOE is "not seeking to set general policy [in New York City]; it [is] just trying to operate as if it were an ordinary general contractor whose actions [are] 'tailored to one particular job.'" *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1336-37 (D.C. Cir. 1996) (quoting *Boston Harbor*, 507 U.S. at 232). The absence of any policy advanced by the DOE confirms that the DOE is acting as a market participant and not a regulator in issuing the RFB containing the EPPs.

**D.    The EPPs Are Sufficiently Narrow So as to Not Amount to Setting Policy or Issuing Impermissible Regulation.**

Plaintiffs' argument that the challenged RFB is not sufficiently narrow is unavailing to bring the DOE outside the scope of a market participant here.

First, Plaintiffs argue the RFB is regulatory conduct because its impact is "industry-wide," "broad in scope and clearly designed to effect a policy." TRO Hearing Tr. at 15-16. Even if that were the case here (it is not, *see* D'Amato Decl. at ¶¶ 7-10, 13, 18), Plaintiffs

misconstrue the Second Circuit's analysis of the "narrow scope of the challenged action" when determining whether a government entity is acting as a market participant.  According to the Second Circuit, "[a] contract is 'specifically tailored to one particular job' within the meaning of [*Boston Harbor*] if it governs the parties' behavior on the specific project or projects rather than on unrelated matters to which the state might not even be a party."  *BIECA*, 678 F.3d at 189 n.2 (quoting *Boston Harbor*, 507 U.S. at 232).

There should be no dispute here that the range and type of conduct covered by the DOE's proposed specifications is sufficiently "narrow" to constitute market participant conduct.  The Bid Specification applies only to a portion of the bus contracts the City needs to service its school-age student population.  D'Amato Decl. ¶ 7.  Moreover, the bid specifications carry out the DOE's goal of redesigning its school-age transportation contracts to enact specific contract provisions it has determined are necessary for these contracts in the current circumstances.  EPP Memo at p. 17.  Finally, as discussed above, the DOE is not pursuing any overarching policy goal here that would affect the entire school bus transportation industry; instead, it seeks only to implement certain terms in its *own* school-age transportation contracts that it deems important at this time.  *See supra* at 5-7; D'Amato Decl. at ¶ 7; EPP Memo at p. 18.

At the TRO Hearing, Plaintiffs erroneously asserted that the EPPs are designed to be industry-wide, but on the Court's correction, conceded that "[i]t is not that they completely engulf the field."  TRO Hearing Tr. at 36-37.  Rather, as the Court pointed out, the EPPs have no impact on municipal school bus contracts on Long Island, Westchester, or anywhere outside the New York City school district.  *Id.*; *see also* Robinson Decl. ¶ 9.  Nor do they have any impact on school bus transportation contracts between private parties in New York City.  Robinson Decl. ¶ 6.  And nor is there any allegation or suggestion that *other* DOE service contracts (including those for Pre-K school transportation, ambulance services, and other non-school bus transportation services) include EPPs or similar provisions.  D'Amato Decl. ¶ 13, 18.  The Court's observations and Plaintiffs' concessions at oral argument confirm that the DOE's conduct fits squarely under the market participant doctrine.

Plaintiffs' reliance on *Chamber of Commerce*, 74 F.3d 1322 and *Van-Go Transport*, 53 F.

Supp. 2d 278; does not alter this conclusion.  *See* TRO Hearing Tr. at 16, 17, and 37, and Pl.

Opening Mem. at p. 21, 23.  There, unlike here, the challenged Presidential Executive Order

barred the federal government from entering contracts with employers who hire permanent

replacements during a lawful strike.  This order, however, extended too far, sweeping under its

wing not only employers working on specific government contracts, but also related entities that

did not work under such contracts.  *Id*. at 1338.  The court easily found that the order "was a

regulatory effort to set a broad policy governing the behavior of thousands of American

companies and affecting millions of American workers."  *Id*. at 1337.  Accordingly, the

Executive Order was preempted.

Several years later, the D.C. Circuit, echoing *BIECA*, found that a government's actions

limited to its own, specific contracts do not run afoul of preemption rules.  *Bldg. & Constr.*

*Trades Dep't v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002) (explaining that the holding in *Chamber*

*of Commerce* was based upon the impact of the requirements beyond the government's contract

with the contractor, and upholding an Executive Order requiring federal agencies and private

contractors to maintain neutrality regarding PLAs in federally funded construction projects).

Though the Order there extended to all such contracts, it only applied to those contracts and did

not encompass any work contractors performed on other, nongovernmental projects.  As the

court explained:

> Because the Executive Order does not address the use of PLAs on
> projects unrelated to those in which the Government has a
> proprietary interest, the Executive Order established no condition
> that can be characterized as "regulatory."

*Id*. at 36.  By contrast here, the DOE has not promulgated any state or city-wide requirement that

could be subject to preemption.  The challenged Bid Specifications are limited to services

performed under a specific set of contracts awarded through this RFB.  They do not require

successful contractors to comply with the EPPs in connection with work performed under other

contracts (with the DOE or with other parties) and the EPPs do not extend to any affiliated entities.[15]

In any event, to the extent Plaintiffs attempt to read *Van-Go Transport* to declare a measure to be insufficiently narrow for proprietary classification simply because it applies to a group of governmental contracts, such a reading is inconsistent with the foregoing appellate precedents, which hold that the narrowness question looks not to whether a group of contracts is involved, however broad, but whether the reach of the challenged measure extends *beyond* a government's relationship with the contracting parties.  Neither the contract provisions at issue here, nor those upheld in *Boston Harbor*, *BIECA*, and *Allbaugh*, extend as far as the challenged policy in *Van-Go*, the impacts of which were felt more beyond just the parties to a government contract, and Plaintiffs' preemption claim fails.

Finally, Plaintiffs' argument that the EPPs contain requirements that conflict with their current CBAs is also of no moment.  *See* Pl. Opp. Mem. at p. 1; TRO Hearing Tr. at 9:5-14. Should Plaintiffs elect to submit bids, and if those bids are successful, and, as a result, if any of the ten (out of 17) Plaintiffs who have CBAs with various unions agree to contract terms that they believe conflict with their respective CBAs, they are entirely free to renegotiate with their respective unions (or to do so in advance of submitting a bid).  Changes in local and state law regularly impact the terms of CBAs, but such impact does not result in NLRA preemption, and are not the kind of alleged "extracontractual effects" on union contractors warranting preemption.  *BIECA*, 678 F.3d at 188-190 ("The effects that BIECA complains of are entirely ordinary consequences of PLAs, in private as well as public contracts.  Project labor agreements

---

[15] Plaintiffs' reliance on the First Circuit's decision in *Merit Constr. Alliance v. City of Quincy*, 759 F.3d 122 (1st Cir. 2014) is even less helpful here.  There, the court found a local ordinance requiring a contractor to maintain an apprenticeship program was preempted by ERISA.  The First Circuit's holding, however, is limited, for as the court itself acknowledged, the issue whether the City of Quincy was acting as a market participant or as a regulator was not before the court because the City failed to raise that issue in the court below.  *See* 759 F.3d at 131.  As such, the court did not consider whether the market participant exception to ERISA preemption even applies.

create winners and losers among contractors and labor unions."). *See also RI, Inc. v. Gardner*, 889 F. Supp. 2d 408, 415 (E.D.N.Y. 2012) (rejecting argument that state law is preempted because it sets standards inconsistent with terms of existing CBAs). Plaintiffs' efforts to establish that the DOE acted as a regulator and not a market participant fail.[16]

## CONCLUSION

For the foregoing reasons, and those set forth in the DOE's Memorandum in Opposition to Plaintiffs' Application for a Temporary Restraining Order, Defendant DOE respectfully requests that the Court deny Plaintiffs' application for a Preliminary Injunction.

Dated: April 17, 2018                  Respectfully submitted,


                                       MORGAN, LEWIS & BOCKIUS LLP

                                       By: */s/ Melissa D. Hill*
                                            David A. McManus
                                            Melissa D. Hill

                                            101 Park Avenue
                                            New York, NY 10178-0060
                                            Phone: (212) 309-6000
                                            Fax: (212) 309-6001
                                            david.mcmanus@morganlewis.com
                                            melissa.hill@morganlewis.com

                                            *Attorneys for Defendant Board of Education of*
                                            *the City School District of the City of New York*
                                            *d/b/a New York City Department of Education*

---

[16]   For the reasons set forth above and in the DOE's opposition to the TRO application, Plaintiffs are unlikely to succeed on their ERISA preemption claim as well. (Doc. 12, at p. 15-17, n.9.) As noted in DOE's first brief, while the Second Circuit has yet to address the issue directly, several courts, including recently the Sixth Circuit, have applied the market participant exception to ERISA preemption as well. (*Id.* at p. 19, n.11.)